Kimberly ALLEN, Petitioner,

v.

**DISTRICT OF COLUMBIA POLICE & FIREFIGHTERS' RETIREMENT & RELIEF BOARD, Respondent.**

No. 86–1623.

District of Columbia Court of Appeals.

Argued Oct. 28, 1987.
Decided April 19, 1989.
Rehearing Denied July 12, 1989.

Robert E. Deso, with whom James P. Wheeler, Washington, D.C., was on the brief, for petitioner.

Charlotte Brookins, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before MACK and STEADMAN, Associate Judges, and REILLY, Senior Judge.

REILLY, Senior Judge:

A police officer seeks review of a decision by the District of Columbia Police and Firefighters' Retirement and Relief Board ("the Board") holding him "psychiatrically incapacitated for further duty" and thereby disabled from performing useful and efficient service in the Metropolitan Police Department because of a "serious character disorder." The Board also found that petitioner's "condition" was not incurred in the performance of duty. Pursuant to this order petitioner was involuntarily separated from the department and denied entitlement to retirement benefits as he had served less than five years on the force.[1]

On review, petitioner asserts three grounds for vacating the decision and order: (1) the Board's finding that petitioner was disabled "for useful and efficient service" is "inadequate as a matter of law"; (2) the Board committed harmful error in relying upon hearsay evidence; and (3) the

---

1. Under D.C.Code § 4–619 (1988 Repl.), an officer may be terminated without retirement benefits if he becomes "injured or contracts a disease during his first five years of service ... [that] disables him from performing further duty in his department," and the Board finds that such injury or disease was not incurred in the performance of duty. The Board's determinations made in "interim" and "final" orders and in slightly different phraseology, appear at the end of its final decision. Petitioner does not contest the finding that his psychiatric condition was non-service connected. His position is that the basic finding of disability was wrong and cannot be supported.

Board's finding is not supported by substantial evidence. After examining the record, we have concluded that the challenged decision is lacking in evidentiary support, and therefore must be set aside.

## I.

The events which brought about these involuntary retirement proceedings may be summarized as follows.

Petitioner Allen joined the police force on December 14, 1981, shortly after being honorably discharged from the Navy, having served four years as an enlisted man subsequent to his high school graduation. At the time of the retirement hearing, he was twenty-seven years old and had completed all but ten days of "his first five years of service" [2] in the department.

During this period, he had received several commendations from his superiors and at the end of his fourth year of service—1985—he was given the highest departmental rating available to an officer—"outstanding." The transcript of the hearing, however, also discloses that a few months after his marriage in 1983, he became friendly with a Miss Susan Barton, manager of the stadium ticket office of the Redskins' football club—a position which enabled her to sell tickets for seats not reserved by season subscribers to police officers and other personal acquaintances. In January of 1984, she sold Allen a ticket to a post-season game in Florida which she also attended. This trip culminated in a sexual liaison which lasted for about two years, in the course of which she bore an infant girl by him, only a month after his wife had delivered an infant son. No aspect of this dual life apparently interfered

with his official duties, or was drawn to the attention of the police department until the night of January 26, 1986, when his wife telephoned the precinct where Allen was assigned.

Just what Mrs. Allen said in this phone conversation became a matter of controversy at the hearing.[3] According to the report of the duty officer, Lieutenant Sarris, she told him that her husband stated (in a telephone call) that he was going to kill himself. At that time the couple were not living together—Allen having a separate apartment. The lieutenant reached him there and was informed by Allen that everything was all right, that he had just spoken to a chaplain about his problems and would answer roll call at 6:30 the next morning. Allen was instructed to turn in his revolver during the interim. He did not do so. When he reported that morning, he was sent to the police clinic, interviewed by a staff psychiatrist, Dr. D'Agostino, and placed upon sick leave for stress for about five weeks.

The Board found (correctly) that these calls had been precipitated by what Mrs. Allen had learned when, at Miss Barton's request, the two women had met earlier that day at a shopping mall. The wife then discovered that contrary to what she had been told, her husband's amorous relationship with the other woman was still continuing—they were to meet that evening—and each had received conflicting statements from Allen of his intentions with regard to their future.[4]

While on sick leave, Allen declined to take antidepressant drugs prescribed by Dr. D'Agostino who then referred him to a consulting psychologist, Dr. Silber, for a

---

**2.** *See* D.C.Code § 4–619, *supra* note 1. An officer involuntarily retired for injury or disease after five years of service is entitled to some pension, even though the disability may not have been incurred in the performance of duty—a condition precedent to a full pension.

**3.** At the hearing, Mrs. Allen testified that her husband had not threatened to kill himself during the telephone conversation which prompted her call to the police station, but stated that his reaction when he learned that she had talked to Miss Barton was so outraged and terrible that

she felt that only his colleagues on the police force could calm him down. Even assuming that his wife might have inferred a suicidal threat from her husband's emotional reproaches, such threat was apparently an empty one for he decided to pour out all his troubles upon the police chaplain before undertaking any solution of his problems.

**4.** Miss Barton, according to Allen's testimony, had discussed with him the possibility of his seeking a divorce.

full evaluation. After subjecting him to a battery of tests and a personal interview, Dr. Silber in a report dated February 27, 1986, a month after Allen's being placed on administrative leave, found that despite some personality shortcomings,[5] "[n]o psychiatric diagnosis on Axis I seems warranted; the possibility of a mild personality disorder exists, but the evidence to sustain one is not conclusive." The department accepted this report as establishing an absence of any mental deficiency and restored him to active duty the following month (March 1986).

About a month after his reinstatement, April 2, 1986, Allen visited Miss Barton at the Stadium ticket office; an altercation ensued between them and one of her co-workers. The latter called two police sergeants to the scene who ordered Allen to leave. Later that day, Allen went to Miss Barton's home in Landover, Maryland. Her co-worker was also on the premises. Again there was a noisy quarrel which was terminated when two policemen on the Prince George's County force were summoned.

Miss Barton complained to Allen's supervisors, who revoked his police powers, placed him on leave with pay, ordered him to report again to the psychiatric clinic, and instructed him to stay away from the Barton home and place of employment until the investigation of the incident was completed. The record indicates that he was examined at the clinic the next day. As his mental status was found to be normal, the psychiatrist who interviewed him restored him to duty immediately, although noting a need for further therapy.[6] This apparently ended the investigation.

There is nothing in the record of any further contact between Allen and Barton until July 14, when by prearrangement he was permitted to pick up his daughter and was prepared to spend the day with her. According to his testimony, Miss Barton suddenly informed him, in breach of their understanding, that the child would have to be returned by early afternoon. This produced another quarrel and a complaint by the mother to Allen's superior, Captain Widawski, who requested the clinic to make a further psychiatric evaluation of Allen, in a memorandum, reporting "a strong degree of animosity towards his ex-girl friend...." Allen reported the next day to Dr. D'Agostino. His notes seem to confirm Allen's version of the altercation. The officer was not suspended but remained on active duty.

Allen testified without contradiction that after this visitation squabble, he made no further attempts to visit Miss Barton as his lawyers had advised him to "stay away from her" because of a pending paternity action. The record contains no description of that lawsuit except for Allen's testimony that after he told her he would sue for custody unless she recognized his visitation rights, she "beat him to the punch by filing first." Counsel's brief states that Allen then filed a counterclaim for custody.

The event that prompted the initiation of involuntary retirement proceedings occurred a month later, on August 14, 1986. Miss Barton, having been notified that her car, while parked at Landover Shopping Mall, had been damaged by removal of the valve stems from two tires, filed a complaint with Prince George's County police to the effect that Allen was to blame. She relayed this complaint to Allen's precinct and also reported that the officer who had witnessed the act of vandalism had identified Allen as the perpetrator from a photograph complainant provided. This led to the issuance of a misdemeanor arrest warrant and a summons to trial in a county

5. The report characterized Allen as somewhat "exploitative in his relations with others," not especially constrained by a sense of guilt or shame, "not emotionally dependent on others" and "somewhat immature emotionally." But it also noted, *inter alia,* that he was "above average intelligence," and that "[t]here was no indi-cation that his concentration on or problem-solving ability is impaired. His memory is average, and his perceptual-motor activity is above average."

6. This report, difficult to read and unsigned, appears to be in the handwriting of Dr. Raher.

court.[7]

As a result of official reports to the D.C. Police Chief, Allen's police powers were revoked, and a notice of proposed suspension without pay was served upon him. Although he submitted an answer supported by affidavits, he was notified on September 16 that the proposed suspension would stand. At the hearing, Allen testified without contradiction that the suspension was lifted two days later and that he was restored to pay status. Dr. Raher corroborated this testimony, saying that it was his understanding that the Department decided to hold the matter in abeyance— until the "outside authorities [presumably the trial court] acted...." [8]

A few days later (September 22, 1988), Allen incurred the wrath of the psychiatric clinic by applying to Dr. D'Agostino for sick leave, complaining of loss of appetite and sleeplessness. The latter, thinking this visit a pretext for avoiding suspension without pay, refused his request, whereupon Allen in the presence of Dr. Raher retorted that the clinic would be responsible for whatever happened over the weekend. Raher immediately made a written entry into Allen's chronological medical record characterizing him as "manipulative, psychopathic, blaming everyone else for his problems, uncooperative, etc." He concluded that "this combination of *extreme immaturity, impulsivity, manipulative behavior*, and, above all, *total inability to take* responsibility for actions make him a *very undesirable* person for police work," and noted that "further evaluation for fit-

ness for duty is in order." (Emphasis supplied.)

Soon thereafter, Raher and D'Agostino, who agreed with his comments, arranged for such an evaluation by another colleague at the clinic, Dr. Schur. The latter's report recommended that Allen's "probationary status be terminated" noting that certain "diagnostic criteria are suggested." Paraphrasing these criteria, the Surgeon's Board then forwarded to the Retirement Board a report (self-described as the consensus of Drs. Raher, D'Agostino and Schur, stating a diagnosis "Disability, Axis I–209–40. Adjustment disorder with mixed disturbance of emotions and conduct. Axis II 309–89 Mixed personality disorder ... Functional Impairment of 10%." [9]

## II.

Having granted Allen a two week's continuance at the request of his counsel, the Board conducted a hearing on the recommended retirement on December 4, 1986— only 10 days before petitioner would have completed 5 years of service. The only witness called to testify in behalf of the recommendation of the Surgeon's Board was Dr. Raher. Before he took the stand, the chairman of the Board announced that a *package of documents*, described by him as the psychiatric service report of the Surgeon's Board and "accompanying medical/surgical documents" would be made part of the record. Counsel objected, pointing out that numerous documents in the package were not medical reports at all, but consisted of police records relating to unsubstantiated complaints, various un-

7. When the Board conducted its involuntary retirement hearing, this charge was still pending. By the time the petition for review was argued, the trial had been held. We were informed that Allen was acquitted.

8. The Board overlooked Raher's testimony in noting an absence of "supporting evidence to confirm" Allen's statement that his suspension was rescinded two days after it had gone into effect. The D'Agostino notes on his periodic interviews with Allen reflect resentment over the refusal of his wife to appear with him for counselling and Allen's continuing failure to retain the services of a Dr. Bernard Malloy, an outside psychiatrist/psychoanalyst, whom he

had recommended. At the hearing, Raher estimated the Malloy fee for a single visit would be $80 or $85—an expense which makes Allen's explanation that he could not afford Malloy's services quite understandable. Yet the Board quoted with approval Dr. Schur's view that Allen's continued service in the police department "could constitute a potential threat to the public" because he did not follow the professional recommendations to seek treatment.

9. Precisely what function was found impaired to this percentage point was left to the reader, including the members of the Retirement Board, to guess.

identified handwritten notes, and irrelevant memoranda he characterized as hearsay and prejudicial. The Board overruled his objections, explaining that as all documents had been presented by the Surgeon's Board, it was the responsibility of the Retirement Board to determine what weight it would give any document.[10]

Questioned by members of the Board as to what the diagnosis of "adjustment disorder" and "mixed personality disorder" really meant, Dr. Raher mentioned "impulsivity," "negative behavior as reflected in his actions outside the police force," "unresponsiveness to treatment" and some other character traits specified in the Schur report as justifying the recommendation of termination of his probationary status.

On cross-examination, however, Dr. Raher had difficulty in explaining why any of the character defects specified would disable Allen from performing his police duties. The transcript discloses this exchange:

Q. Going back to Dr. Schur's report again on page 7 of the documents, page 4 of his report, there is the statement, "Furthermore, left untreated, this unintegrated officer could present a potential threat to the public since he has repeatedly failed to implement the seriousness of the professional recommendation made to him to seek treatment."

Now, that statement is couched in terms of future possibilities. Is that not correct?

A. Yes. Potentially might be—

Q. Potentially? Officer Allen, other than the periods for which he was suspended that you referred to, was in a full-duty status throughout this period of time. Is that not correct? And to the best of your knowledge was performing duty adequately?

A. Yes.

Q. And is it not correct that he has been, from a psychiatric point of view, not restricted from performing duty at the present time?

A. Right.

Q. So that, at the present time, he is capable of performing duty from a psychiatric point of view. Is that not correct?

A. Yes.

Q. So, therefore, he is not disabled. Is that not correct?

A. No, I don't think he's disabled.

Q. Thank you, I have no further questions.

Perceiving that if this concession were allowed to stand, the Board would have no basis for sustaining the recommended involuntary retirement, the Chairman interposed:

### BY CHAIRMAN HAIRSTON:

Q. Is it your testimony, Dr. Raher, to contradict what you said earlier that the man is disabled and should be—that he cannot perform usefully and efficiently and should be retired?

A. I mean in the sense that he's not incapable of functioning outside, but I think he's disabled for—as far as police duties is [sic] concerned.

Q. That's not what Counsel asked you, Dr. Raher.

A. Well, I don't know what he means by "disabled." ·

Q. But you say that he wasn't disabled and that he can't perform at this time, and I asked—I just want to get clear if that's what your medical statement is.

MR. SILER: I think this time Counsel asked him if he was disabled, period.

CHAIRMAN HAIRSTON: Yes.

### BY CHAIRMAN HAIRSTON:

Q. Counsel asked you if he was disabled, period. I'm saying if that's your answer, fine. I just want—the Board needs to know that in order to—to make

---

**10.** Petitioner seeks judicial review of this ruling. While his objections were not completely unfounded, we have treated these documents as part of the record as petitioner failed to request the Board to call the authors of these reports to the stand or make any attempt to serve subpoenas on them. *See Dowd v. District of Columbia Police & Firefighters' Retirement & Relief Board,* 485 A.2d 212, 215–16 (D.C.1984).

a decision in this case. But you had said earlier, upon my questioning, that he could not perform useful and efficient service for the Department and that he was disabled. Now, are you changing that statement?

A. No. I'm—my first statement is correct.

Q. Well, what did you mean in answer to Counsel's statement?

A. Well, there are—there are situations, when you have a person who may be disabled for a certain—to perform duty for the Police Department—

Q. Yes?

A. —but may not be disabled in terms of some other kind of occupation. They could take up carving or something like that, but, I think for the police work, he's—I would consider him disabled. I think he's—he has all these character problems that I mentioned, and, from that point of view, I find that he is disabled for police work. He's out of control, at this point.

At this juncture, petitioner's counsel asserting a "change in testimony" resumed cross-examination, had the reporter read back the original colloquy, propounded additional questions, and finally elicited a limited qualification of Dr. Raher's recantation with respect to Allen's ability to perform his current duties:

Q. —you did, I believe, indicate to me that from a psychiatric point of view, Officer Allen is capable of performing duty at this time. Was that not your answer?

A. Well, I just explained to you that—

Q. Well, was that—

A. —I do—I do not believe he is fit for duty. Okay? That—as concrete as evidence that—

Q. He hasn't been restricted from duty from a psychiatric point of view, has he?

A. He works in a certain—special area which I don't feel necessarily is going to invite any kind of acting out, and I—it's

a clinical judgment about permitting—as far as working as a full-time policeman, I don't think he's fit for duty.

In rebuttal, petitioner called his wife as a witness. She denied that during the emotional outburst of January 26th, petitioner had threatened her with violence or had said that he was going to take his own life. She explained that they were living together and attempting to patch up their domestic difficulties. Petitioner then took the stand in his own defense, denied ever saying that he proposed to commit suicide, or had threatened any physical violence to his wife, former lover, or anyone else. He also testified that he was at home with his wife and little son the night the Barton car was vandalized and produced a witness to corroborate him on this point. He testified that he had never been reprimanded for any breach of police duties and introduced documentary evidence of several commendations by his superiors, an efficiency rating of "outstanding" and a subsequent rating of "average," for the current year signed by Captain Widawski, his commanding officer.

When the hearing ended, the Board immediately went into executive session, circulated a vote sheet, and issued an order finding petitioner "psychiatrically incapacitated for further duty by reason of disability incurred other than in the performance of duty." This order involuntarily separating petitioner from the Police Department was made effective at the close of business the following day, December 5, 1986. It was not until January 16, 1987, that the Board made its "findings of fact, conclusions of law, and decision," and handed down its final order of that date, retroactively effective to the December date specified in its previous order. Apparently the reason for this hasty disposition of the case was the fact that petitioner would have been entitled to some retirement allowance had the Board not taken action before December 14, 1986.[11]

11. Although such agency action appears to be of questionable validity under the leading case of *S.E.C. v. Chenery*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the petition for review does not assign as error the unusual procedure adopted by the agency. When one of the Board members had to leave before the hearing was over, the Chairman announced that she could

### III.

In our opinion, the Board's determination that petitioner was disabled from performing useful and efficient service in the Department, is fatally defective, not only because many of the preliminary findings of fact upon which it was based are without evidentiary support, but is also inadequate as a matter of law. *See Dowd, supra,* 485 A.2d at 215 n. 10 (Board's findings must be supported by substantial evidence.) Under the governing statute, the function of the Board is to determine whether an officer "is injured or contracts a *disease* which disables him from performing further duty." (Emphasis supplied.) Although a mental disorder (*e.g.,* schizophrenia, dementia praecox, aphasia, paranoia) may fall into the category of a "disease," *see e.g., Wingo v. Washington,* 129 U.S.App.D.C. 410, 412–13, 395 F.2d 633, 635–36 (1968), a finding of what particular disease existed which disabled petitioner from performing his police duties is absent. Nor is there any finding or explanation as to why the psychological condition attributed to petitioner is a disabling one.

The involuntary retirement challenged here—amounting to involuntary separation—was purportedly authorized under D.C. Code § 4–619, which refers to an injury or disease during an employee's first five years of service which "disables him from performing further duty in his department." Slightly different wording is used with respect to the section dealing with non-service incurred disability after five years of service, *id.* § 4–615, *i.e.,* "which disability precludes further service with his department," *id.,* and in § 4–616, dealing with service connected disability, *i.e.,* "such injury or disease ... permanently disables him for the performance of duty." None of the foregoing provisions define what is meant by the terms "disabled or disability," so that in construing them we have attached no importance to these differences in phraseology, but relied upon D.C.Code § 4–607(2) as applicable to all these enumerated sections, defining these terms as meaning "disabled for *useful and efficient service in the grade or class of position last occupied* by the member by reason of disease or injury...." (Emphasis supplied.) *See Wells v. District of Columbia Police & Firefighter's Retirement & Relief Board,* 459 A.2d 136, 138–39 (D.C.1983) (en banc); *Price v. District of Columbia Police & Firefighters Retirement & Relief Board,* 542 A.2d 1249, 1253 (D.C.1988).

Here, the basic finding of the Board was that petitioner "is extremely immature and demanding [and] this immaturity has caused member to behave manipulatively, impulsively, exploitively, and deceitfully." The Board then proceeded to recite a series of incidents which produced this conclusion, none of which occurred in petitioner's exercise of police powers or performance of official duty.

Granted that these character traits are undesirable. Yet, the Board made no attempt to explain why such traits rendered petitioner incapable of performing the duties of the job to which he is currently assigned. In fact, the Board's published decision does not even refer to the tasks such job entails, let alone describe how an impairment of ten percent of some "axis" would affect his ability to carry them out. It also ignores Dr. Raher's reluctant concession that the position last occupied by petitioner [*i.e.,* special operations detail] was in a special area that he did not feel "necessarily is going to invite any kind of acting out," but accepted his view that petitioner "was not fit for working as a full-time policeman." This concession could have been enough to bar an involuntary retirement order. *See Seabolt v. District of Columbia Police & Firemen's Retirement & Relief Board,* 413 A.2d 908 (D.C.1980).[12]

Where involuntary separation under Section 4–619 is ordered by the Board for a disability unrelated to official service, the evidence against the officer should clearly

---

review the transcript before the case was considered. Obviously, no transcript was available when the critical vote was taken and that member had not returned.

12. *Accord, Wells, supra,* 459 A.2d at 138–39; *Price, supra,* 542 A.2d at 1253.

preponderate and be supported by findings setting forth material facts. *Wingo v. Washington, supra,* 129 U.S.App.D.C. at 412–13, 395 F.2d at 635–36; *Hobson v. District of Columbia Police & Firemen's Retirement & Relief Board,* 452 A.2d 1182 (D.C.1982). The wording of § 4–607(2) requires that the applicable test is inability to perform any service at the officer's salary level that is "useful and efficient." The Board's decision here fell far short of that standard.

The Board also overlooked the fact that the psychiatric experts upon whom it relied, and who in turn appraised Allen's character in terms of fitness, desirability and "suitable material" for retention as a police officer—in contradistinction to disability—were acting under the mistaken premise that Allen was a probationer. Dr. Raher testified that this was his assumption. Moreover, the recommendation of Dr. Schur, as the Board's opinion noted, *viz.,* that Allen's "probationary status be terminated," reveals that the author of this report labored under the same impression.

Actually, Allen was not a probationer, but had attained a permanent career status some years before, having completed the one year probationary period on December 14, 1982. *See* D.C.Code § 1–608.1(a)(5) (1987 Repl.). As such, he could be dismissed, demoted or suspended for more than thirty days only for cause. *Id.* § 1–617.1(b).

In determining that the psychiatric difficulties attributed to Allen disabled him from further service, the Board leaned heavily on Dr. Schur's report. Notwithstanding that the criteria utilized by him were standards appropriate only to an appraisal of a probationer's suitability for permanent appointment, the Board quoted with approval the concluding paragraph of the Schur report, except for one sentence which it deleted.[13]

The Board's determination that such psychiatric diagnosis demonstrated that Allen was disabled or incapacitated from further service does not flow rationally from the facts. It appears to us that the Board, in leaping to this conclusion, mistook its function. *See Brewington v. District of Columbia Board of Appeals and Review,* 299 A.2d 145 (D.C.1973). It is one thing to say that the reports of physical and psychiatric examinations by the police clinic should be given weight for purposes of approving probationary performance or for appraising the suitability of career officers for particular assignments or promotion, but quite another thing to rely upon them as justification for compulsory retirement unless such reports reveal an injury or disease of a completely disabling nature.

Moreover, the Board's decision is fatally flawed by several findings of fact not supported by the evidence. One of the most serious was its reliance on Dr. Raher's testimony in its finding incapacity to perform his police duties in the face of that witness' retraction of his opinion on this point, noted *supra.*

One glaring example was the finding that petitioner's personal life interfered with his police work because, *inter alia,* of the pending charge of vandalizing the Barton car. The Board obviously accepted the charge as true, as it speaks of positive identification by "an off-duty Prince George's County police officer," and the suspension by the department here, ignoring the lack of any determination of guilt, and the sworn testimony that Allen was miles away when this incident occurred.

While the Board was not required to await the outcome of the court trial—as

---

**13.** "His threatening behavior both to himself, wife, girlfriend, commanding officers, and others demonstrate a personality organization that is decidedly unintegrated and maladaptive to a role in which the demands of interpersonal sensitivity, judgment, restraint and acumen are of special pertinence." The deletion is significant, for the missing sentence revealed that the final diagnosis was based—at least in part—upon a factual premise that was false. There is nothing in the record of any threatening behavior to his wife, except for Dr. D'Agostino's speculation that threats by him might have deterred her from availing herself of his counselling. His "girlfriend" in answer to a questionnaire disclaimed he had threatened her with bodily harm during the visits resulting in complaints to police. No threats to commanding officers were ever reported. The Board itself made no findings of threats to any other person.

the department eventually decided to do when it lifted the suspension—it should at least have invited testimony to enable it to determine the truth of the charge. Obviously, however, the Board by referring to a "positive" identification as conclusive proof of the allegation, and then inferring some mental disorder therefrom, made an assumption unsupported by the evidence.

Another example was the finding that Allen manipulated his wife and girlfriend by threats. In deeming him guilty of threatening his wife physically, the Board disregarded not only her testimony to the contrary, but also failed to note that no such threat is mentioned in the police report of her telephone call to which the Board attached such credence in finding that Allen had threatened suicide. Instead, it relies upon some reference in the Silber summary of his diagnosis referring to a non-existent police report and Dr. D'Agostino's suspicions about the reason Mrs. Allen refused to see him for counselling, ignoring her own very plausible explanation. As previously noted, the Board also accepted Dr. Schur's unfavorable diagnosis, which rested in part on the premise that Allen had threatened to *kill* his wife. In short, although the premise that Allen had threatened or continued to threaten his wife with violence is not based upon a shred of even hearsay evidence, it permeates the entire case including not only the testimony of Dr. Raher, the views of his fellow psychiatrists in the clinic, but is also cited in the corporation counsel's brief as a factor supporting the Board's decision.[14]

The finding that Miss Barton has complained on "numerous occasions that [Allen] threatened to take their daughter from her" is also distorted. The threat was not to kidnap the child, but to bring a custody suit. Actions by fathers to gain custody or visitation rights with respect to children born out of wedlock are not uncommon in our trial court. Initiation of such litigation, described as a reflection of "extreme immaturity" in the Board's decision, or as "frenzy" in the Schur memorandum, has not been regarded as a symptom of mental instability by the courts of his jurisdiction.

In its unquestioning acceptance of the opinions of the psychiatrists as "evidence," the Board also ignores the fact that their conclusions show on their face that they were based upon allegations of misconduct, *e.g.*, defacing a sidewalk, threatening to kill a spouse, maliciously vandalizing a car, which were assumed without any attempt to ascertain whether these allegations were proven.[15]

In urging this court to affirm the Board's decision, the government advances a theory which the Board never relied upon in its written findings. According to its brief, his "disabling condition has repeatedly produced conduct ... which simply cannot be tolerated in any police officer.... A mental condition [which] continually causes him to get into scrapes with the law." It argues that "even though the Department continued to employ him in limited duty positions,[16] it still cannot tolerate an officer whose off-duty conduct continually requires the intervention of other officers and other police departments ... continually bringing discredit to his agency and his position." The brief cites as examples of such conduct the police report of

**14.** The government brief inaccurately states that the police, in summarizing Mrs. Allen's telephone call, reported that she had said that her husband threatened her and himself.

**15.** Dr. Raher conceded that one of the documents he included in the packet—a Barton complaint about an uncomplimentary description about her sprayed on the sidewalk, concerning which a police investigation produced no clue as to who had done it—was relevant to the clinic's recommendation because of the mere "possibility that he's involved." He also admitted that "[one] take[s] a lot of things that come up which we're not absolutely certain have occurred.... I can't prove everything that was told to me in ordinary medical cases." Surely in the light of this revelation, it was the Board's obligation to pass on the truth of these allegations before deferring to the opinions of the presumed experts, without any examination of the assumptions of facts upon which these were predicated.

**16.** There is nothing in the record categorizing assignment to the special operations detail as a limited duty position. Members of this detail are armed, empowered to make arrests, and to handle mass disturbances.

Mrs. Allen's call—inaccurately described as revealing threats to his wife as well as himself—the fact that police were called to break up verbal altercations with his "ex-girlfriend," on visits to her office, and later to her home on April 2, and that he subsequently became the focus of a criminal complaint for vandalizing her van.

The brief then asserts that these incidents caused the revocation of Allen's police powers "three different times on the grounds that he might pose a danger to the public if he retained his police powers." The revocation documents, however, are part of the record and disclose no such reason for the actions taken.

Apart from the fact that the record does not support these assertions, it appears that what the government contends is that Allen's actions amounted to such gross misconduct that involuntary separation from the police force was warranted. We agree that actions which bring discredit to the police force, even though committed off-duty, provide grounds for disciplinary sanctions, including, if flagrant enough, the penalty of discharge. In fact, such off-duty misconduct is one of the statutory grounds for removal, demotion, or suspension under the code provisions concerning disciplinary proceedings against civil service personnel. *See* D.C.Code § 1–617.1(d)(16) (1987 Repl.) But when such disciplinary action is undertaken, this same chapter of the code provides a career officer with an entitlement to notice, an opportunity to submit evidence, and a right to appeal a departmental finding to another agency.

It is obvious, however, that it is not the province of the Retirement Board to exercise disciplinary functions, nor did it profess to do so. Hence the government cannot be heard to say that because the record might have justified another agency in concluding that Allen's conduct brought discredit to the police force, the otherwise unsustainable decision of that Board should be allowed to stand.

*Reversed.*