**Joseph G. O'ROURKE, Petitioner,**

v.

**DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.**

No. 10–AA–1193.

District of Columbia Court of Appeals.

Argued June 14, 2011.

Decided June 21, 2012.

Robert E. Deso, Washington, for petitioner.

James C. McKay, Jr., Senior Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Before GLICKMAN and THOMPSON, Associate Judges, and SCHWELB, Senior Judge.

GLICKMAN, Associate Judge:

The question in this case is one of statutory interpretation: whether a police officer who has applied or been recommended for a disability retirement pension under the District of Columbia Police and Firefighters' Retirement and Disability Act (the "Retirement and Disability Act"),[1] loses his eligibility for such a pension if, for any reason, he is terminated from the police force before the Police and Firefighters' Retirement and Relief Board (the "Retirement and Relief Board" or the "Board") finally adjudicates his entitlement to the pension. Petitioner O'Rourke was an officer of the Metropolitan Police Department when he was injured while on active duty. As a result, he was recommended for a disability retirement annuity. While the recommendation was still in the administrative pipeline, the Department commenced a separate and unrelated disciplinary proceeding against O'Rourke. This disciplinary proceeding culminated in a decision to terminate his employment. Upon learning of O'Rourke's termination, the Retirement and Relief Board ruled that he was no longer eligible to receive a disability pension because he was no longer a "member" of the Metropolitan Police. In his petition for review of that ruling, O'Rourke contends that his termination did not sever his right to be considered for a disability pension.

We agree with O'Rourke. We hold that his active membership in the Metropolitan Police Department at the time his retirement on disability was recommended to the Board was sufficient to preserve his

---

1. D.C.Code § 5–701 et seq. (2008 Repl.). All D.C.Code citations in this opinion are to the 2008 Replacement Edition of the Code unless otherwise indicated.

right, upon a determination that he was otherwise eligible, to a disability annuity. As we interpret the Retirement and Disability Act, O'Rourke's subsequent disciplinary termination did not render him ineligible for that annuity. In reaching that conclusion, we depart from our usual deference to an administrative body's construction of the legislation it administers, because we conclude that the Board's interpretation is incompatible with the broader statutory framework and the primary purpose of the Act. We therefore reverse and remand for further proceedings before the Board.

## I.

After serving for twenty-six years with the New York City Police Department and for brief stints thereafter with the U.S. Mint Police and the U.S. Federal Protective Service, Joseph O'Rourke joined the District of Columbia Metropolitan Police Department in 2001. He was then fifty-two years old. O'Rourke was assigned to the Third District, where he served for the next several years as a patrol officer. In July 2007, O'Rourke sustained injuries to his head, hands, and left elbow when he fell onto a concrete walkway while chasing a suspected carjacker. O'Rourke was placed on medical leave; the Director of the Department's Medical Services Division (the "Director") classified his injuries as having been incurred in the performance of duty. A year later, after O'Rourke had undergone various unsuccessful medical treatments, the Police and Fire Clinic, with the Director's approval, recommended to the Retirement and Relief Board that O'Rourke be retired on disability because his "ongoing pain and weakness

of his left hand preclude him from carrying out the full duties of a police officer." [App. 28] Accordingly, the Board held a hearing in February 2009 to determine O'Rourke's eligibility for a disability retirement pension.

A decision by the Board was not soon forthcoming. Meanwhile, in September 2009, the Police Department served O'Rourke with notice of a proposed disciplinary action, namely termination of his employment. O'Rourke was charged with having secured his appointment to the force in 2001 by falsely stating in his Personal History Booklet that he never had been examined by a physician for "a disease or incorrect functioning of any part of [his] body, when [he] in fact underwent a series of tests to determine [his] qualification for disability" on account of a heart condition after he retired from the New York City police force. [S.A. 1A] In March 2010, following a hearing before a Police Department disciplinary panel, O'Rourke was found guilty of this charge, and the Police Department terminated his employment effective May 7, 2010.[2] The notice of termination informed O'Rourke of his right to receive a deferred annuity under the Police and Firefighters' Retirement Plan.[3] It said nothing, however, about his eligibility for the disability retirement annuity for which he had been recommended. That recommendation still was pending before the Retirement and Relief Board.

The Board took note of the disciplinary proceedings. On May 27, 2010, it convened in executive session to consider the impact of O'Rourke's dismissal. Thereaf-

---

**2.** O'Rourke's brief states that his disciplinary termination is currently on appeal to the D.C. Office of Employee Appeals.

**3.** O'Rourke was entitled to this annuity because he had over five years of service with the Metropolitan Police force and had reached the age of fifty-five. *See* D.C.Code § 5–717.

ter, in a decision dated August 26, 2010, the Board concluded that because O'Rourke was no longer a "member" of the Metropolitan Police Department, he was no longer eligible for a disability retirement pension.

## II.

The Retirement and Disability Act provides that police and firefighters may be eligible for two types of disability retirement annuities: one for disabling injuries or diseases incurred or aggravated in the performance of official duty ("POD"), as set forth in D.C.Code § 5–710, and the other for disabilities due to injury or disease not received or contracted in the performance of duty, as set forth in § 5–709. The main difference between the two annuities is the rate of compensation.[4] (An additional difference is that a police officer or firefighter must have completed at least five years of service to retire on non-POD disability, while there is no length-of-ser-

vice condition for POD-disability retirement.[5])

As the Retirement and Relief Board said in its decision, §§ 5–710 and 5–709 provide for the retirement of a disabled "member." The term "member" is defined, somewhat circularly, to include "any officer or member of the Metropolitan Police force." [6] The sections say that a "member shall be retired" on disability only with the approval of the Mayor.[7] The Board, acting in its capacity as the Mayor's agent,[8] construed this statutory requirement to mean that an officer cannot receive a disability annuity unless he is still a "member" of the Police force when the Board has completed its evaluation and is ready to render a decision—regardless of how long that administrative process may take. Therefore, the Board reasoned, an officer becomes ineligible for a disability annuity if he is discharged from the Police force while the Board is still considering his case—even if he would have been entitled to the annuity

---

**4.** For members (like O'Rourke) who joined the Police or Fire Department "after the end of the 90–day period beginning on November 17, 1979," the POD disability annuity "shall be 70% of [the member's] basic salary at the time of retirement multiplied by the percentage of disability for such member ..., except that such annuity shall not be less than 40% of his basic salary at the time of retirement." Id. § 5–710(e)(2)(D). The non-POD disability annuity for such members "shall be 70% of [the member's] basic salary at the time of retirement multiplied by the percentage of disability for such member ..., except that such annuity shall not be less than 30% of his basic salary at the time of retirement." Id. § 5–709(b). In contrast, the ordinary deferred annuity under the Police and Firefighters' Retirement Plan is computed at the rate of 2.5% of the member's average pay for each year of service (increasing to 3% for each year of service after twenty-five years), and is capped at 80% of the member's average pay. Id. § 5–717.

**5.** See id. §§ 5–709(b), 5–710(e)(1).

**6.** Id. § 5–701(1)(A). The term "member" also encompasses "any officer or member" of the Fire Department and certain other law enforcement and emergency medical personnel. Id. § 5–701(1)(A), (B) (2011 Supp.).

**7.** Id. § 5–710(c) ("A member shall be retired under this section only upon the recommendation of the Board of Police and Fire Surgeons and the concurrence therein by the Mayor, except that in any case in which a member seeks his own retirement under this section, he shall, in the absence of such recommendation, provide the necessary evidence to form the basis for the approval of such retirement by the Mayor."); id. § 5–709(b) ("Whenever any member ... completes five years of police or fire service and is found by the Mayor to have become disabled due to injury received or disease contracted other than in the performance of duty, which disability precludes further service with his department, such member shall be retired on an annuity....").

**8.** See id. § 5–722(a)(1).

had the Board acted more promptly. The Board noted that this conclusion was consistent with an unpublished 1997 opinion of this Court.[9]

## III.

 Our review of the Board's construction of the Retirement and Disability Act is *de novo,* for this court is "the final authority on issues of statutory construction"[10] and "the ultimate interpreter of the statutory provisions from which the Board, as a creature of the legislature, derives its powers."[11] Ordinarily, we have good reason to respect an administrative agency or board's informed interpretation of the statute it administers, and we will defer to it "as long as that interpretation is reasonable and not plainly wrong or inconsistent with [the statute's] legislative purpose."[12] But those caveats are important. We owe no deference where the administrative body has not considered the policy underlying the statute and has reached a result that is contrary to the purpose of the legislation and not reasonable.[13] Because we perceive that to be the basic flaw in the Board's interpretation in this case, we do not defer to it and we must reject it.

 "The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning."[14] If the statute is "clear and unambiguous, we must give effect to its plain meaning."[15] But our focus cannot be too narrow, for "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself," but also by considering "the specific context in which that language is used, and the broader context of the statute as a whole."[16] "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole."[17] In short, we must construe

9. In *Hart v. District of Columbia Police and Firefighters' Retirement and Relief Board,* No. 96–AA–366 (D.C. Oct. 24, 1997), a division of this Court held that the petitioner was not eligible for retirement disability benefits because, having been dismissed from the police force not long after her hearing before the Board, she was no longer a member of the force at the time the Board was ready to render its decision. As the opinion in *Hart* was unpublished, it is not binding precedent. *See* D.C.App. R. 28(g).

10. *Harris v. D.C. Office of Worker's Comp. (DOES),* 660 A.2d 404, 407 (D.C.1995).

11. *Ridge v. Police and Firefighters Ret. and Relief Bd.,* 511 A.2d 418, 426 (D.C.1986).

12. *McCulloch v. D.C. Rental Hous. Comm'n,* 584 A.2d 1244, 1248 (D.C.1991).

13. *See, e.g., Ridge,* 511 A.2d at 426 (rejecting Board's construction of disability retirement statute as unreasonable in view of "the public policy which requires us to construe the retirement statute liberally in light of its humane purpose"); *see also, e.g., Proctor v. D.C. Dep't of Emp't Servs.,* 737 A.2d 534, 538 (D.C. 1999) ("[W]hen it appears that the agency ... did not conduct any analysis of the language, structure, or purpose of the statutory provision, it would be incongruous to accord substantial weight to the agency's interpretation.") (internal citation, quotation marks, and brackets omitted).

14. *Hospitality Temps Corp. v. District of Columbia,* 926 A.2d 131, 136 (D.C.2007) (internal quotation marks omitted).

15. *James Parreco & Son v. D.C. Rental Hous. Comm'n,* 567 A.2d 43, 45 (D.C.1989).

16. *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

17. *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (internal quotation marks and citations omitted).

§§ 5–709 and 5–710 "not in isolation, but together with other related provisions," and derive their meaning "not from the reading of a single sentence or section, but from consideration of [the] entire enactment against the backdrop of its policies and objectives."[18]

The Retirement and Relief Board reads the word "member" in §§ 5–709 and 5–710 restrictively, to include only someone who is a "current member"—as opposed to a "current or former member"—when the administrative decision finally is made whether to retire him on disability. If our analysis not only started, but also ended, with the words of the two statutory sections in question, this would be a possible reading. It is not an obvious or necessary reading, however. "[T]here is no temporal qualifier [of the word "member"] in the statute[s] such as would make plain" that only current members may be retired on disability.[19] The definition of "member" in § 5–701(1) likewise contains no temporal qualifier. Moreover, both § 5–709 and § 5–710 include a provision that plausibly supports the broader reading that a disabled officer need only be an active "member" when the recommendation or application for retirement on disability is submitted to the Board in order to be eligible to receive a disability pension. Section 5–710(e–1) states that

Whenever the Board of Police and Fire Surgeons receives a recommendation from the Director for a disability retirement of a Metropolitan Police Department or Fire and Emergency Medical Services Department member pursuant to Chapter 6A of this title, the Board of Police and Fire Surgeons shall make a disability assessment and, if the member is unable to perform the full range of duties, shall retire the member as disabled regardless of whether the member is performing useful and efficient services that are less than the full range of duties. The member shall be retired on an annuity determined in accordance with subsection (e)(2) of this section [explaining how the amount of the annuity is calculated for a member retired for disability incurred or aggravated in the performance of duty]. [Emphasis added.]

Section 5–709(c) is materially identical. In conjunction with the mandatory character of the language in these provisions, we cannot ignore the fact that "the member" to whom the provisions repeatedly refer is simply the individual who is the subject of the Director's disability retirement recommendation. Thus, even if considered in isolation, the two statutes may be read as requiring the Board to award a disability pension to a disabled former member who was a current member when the proceedings before the Board commenced. On the face of things, the Board's contrary interpretation is not the only reasonable one, and the statutes are ambiguous.

Does the Board's choice deserve our deference? The Board did not provide a reasoned analysis explaining its construction of the disability retirement statutes in light of the broader statutory framework or the primary purpose of the Retirement and Disability Act. For his part, O'Rourke, seeking to cut the Gordian Knot without

---

18. *Gondelman v. D.C. Dep't of Con. & Reg. Affairs,* 789 A.2d 1238, 1245 (D.C.2002) (internal quotation marks omitted); *see also, e.g., Columbia Plaza Tenants' Ass'n v. Columbia Plaza Ltd. P'ship,* 869 A.2d 329, 332 (D.C. 2005) ("The literal words of [a] statute . . . are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole, and are to be given a sensible construction, and one that would not work an obvious injustice.").

19. *Robinson,* 519 U.S. at 341, 117 S.Ct. 843.

such in-depth analysis, urges us to be guided by the opinion of the Court of Appeals of the District of Columbia[20] a century ago in *Rudolph v. Mosheuvel.*[21] Superficially, the legal question before the court in *Rudolph* was equivalent to the one before us now—whether a fireman injured in the line of duty had a right to be considered for a disability pension even though he was fired before the examining board determined his eligibility for that pension. The fireman's dismissal could not, by itself, vitiate his entitlement to the pension, the court held, because "the right of the relator to retirement on a pension under the terms of the law were [*sic*] fixed at the time he received his injuries, provided, of course, that they permanently disabled him from duty and were not the result of his own indiscretion. The commissioners could not, by dismissing him on charges made thereafter, deprive him of the bounty provided by law, which they had no power to suspend."[22] However, because we operate under a very different statutory scheme today, *Rudolph* is distinguishable, and it is not binding on us here.[23] At most, *Rudolph* is suggestive, not dispositive.

An interpretive issue similar to the one we now confront was presented to the Supreme Court in *Robinson v. Shell Oil Company,*[24] and we find the Court's approach instructive. Section 704(a) of Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer to discriminate against any of his employees or applicants for employment" who have invoked Title VII's protections or assisted others in doing so.[25] Does this statute enable a terminated employee to sue his former employer for post-employment retaliation? "At first blush," the Court said, "the term 'employees' in § 704(a) would seem to refer [only] to those having an existing employment relationship with the employer in question."[26] In context, however, the Court found it ambiguous whether "employees" excludes former employees. Because the opposite reading was "more consistent with the broader context of Title VII and the primary purpose of § 704(a)," the Court resolved the ambiguity by holding that former employees are included within § 704(a)'s coverage.[27]

A similar inquiry into statutory context and purpose in the present case persuades us that the Board's reading of §§ 5–709 and 5–710 is unreasonable. Admittedly, a review of the usage of the term "member" in the immediate statutory environment surrounding these two sections is inconclusive. Sometimes the term "member" is used in other provisions of the Retirement and Disability Act to include or mean former members. For example, the Act refers to officers who have been separated

---

**20.** The Court of Appeals of the District of Columbia was a precursor of the United States Court of Appeals for the District of Columbia Circuit.

**21.** 37 App.D.C. 76 (D.C.Cir.1911).

**22.** *Id.* at 82.

**23.** Unlike the present case, *Rudolph* involved the right of a firefighter injured in the line of duty to receive payments from a statutory relief fund to which he and other firefighters had been required to contribute via deductions from their pay. *Id.* at 81. For that reason, the case did not involve a statute comparable to the Retirement and Disability Act now before us. Under that Act, disability annuities are not funded by the members of the Police and Fire Departments.

**24.** 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

**25.** 42 U.S.C. § 2000e–3(a) (2006).

**26.** *Robinson,* 519 U.S. at 341, 117 S.Ct. 843.

**27.** *Id.* at 346, 117 S.Ct. 843.

from the service simply as "members" when it provides how they may reestablish lost annuity rights.[28] The section of the Act dealing with cost-of-living adjustments of annuities similarly refers to retired officers as "members."[29] But the Act is not entirely consistent in this regard; in other places it distinguishes "former members" from "members."[30] The inconsistent usage leaves us guessing; it simply underscores the ambiguity of the term "member" and the inadequacy of the Board's analysis of its meaning in §§ 5–709 and 5–710. "Once it is established that the term [member] includes former [members] in some sections, but not in others, the term standing alone is necessarily ambiguous and each section must be analyzed to determine whether the context gives the term a further meaning that would resolve the issue in dispute."[31]

Considering how the disability retirement provisions fit into the overall statutory framework, we find that the Board's interpretation leads to perverse or incongruous consequences. Consider, first, that the Board's holding is not limited to situations in which the member's employment was terminated, as in O'Rourke's case, for misconduct. A member may retire voluntarily by giving advance notice,[32] or he may be retired for non-disciplinary reasons; the Board's rationale applies equally to all such situations. With that in mind, it is easy to see why the Board's ruling is problematic. To give just one example, D.C.Code § 5–712(b) provides that the Mayor may retire any member of the Metropolitan Police force or the Fire Department who has reached the age of sixty. Suppose an officer is injured in the line of duty and recommended for a disability annuity just as he is on the verge of retirement at age sixty pursuant to § 5–712(b)— the very day before his retirement is set to commence, perhaps. Under the Board's interpretation of the disability retirement provisions, the happenstance of his immediate, mandated retirement at sixty would deprive the officer of a disability annuity simply because the Board could not finish evaluating and processing the disability re-

---

**28.** *See* D.C.Code § 5–717(b)(2)(A) ("Any member who, by electing [upon separation] to receive a refund under paragraph (1) of this subsection, loses annuity rights under this subchapter, may reestablish all such rights at any time prior to attaining the age of 55 by redepositing the amount of such refund plus interest computed in accordance with subsection (c) of this section."); *id.* § 5–717(c)(3) ("If a member elects to make his redeposit in monthly installments, each monthly payment shall include interest on that portion of the refund which is then being redeposited.").

**29.** *See id.* §§ 5–718(b) and(c–1) (referring to "any annuity … which is payable to a member who was an officer or member of the Metropolitan Police force or the Fire Department of the District of Columbia"); *cf.* § 5–721(b) (providing for medical examinations of members receiving annuities under § 5–709 or § 5–710).

**30.** For example, § 5–701(7) defines an "annuitant" as "any former member who, on the basis of his service, has met all requirements of this subchapter for title to annuity and has filed claim therefor." *See also id.* § 5–701(3), (4) (defining the terms "widow" and "widower" to mean the surviving spouse of "a member or former member," provided certain additional conditions are met); *cf. id.* § 5–716(b) (addressing surviving spouse's right to receive an annuity "[i]n case of the death of any member before retirement, of any former member after retirement, or of any member entitled to receive an annuity under § 5–717").

**31.** *Robinson,* 519 U.S. at 343–44, 117 S.Ct. 843.

**32.** *See* D.C.Code § 5–712(a) (providing that an eligible member who wishes to retire voluntarily on a non-disability annuity must give "at least 60 days written advanced notice to his department stating his intention to retire and stating the date of [*sic*] which he will retire").

tirement recommendation quickly enough. We can conceive of no justification for such an arbitrary and harsh result.

Moreover, even if it could be limited to disciplinary terminations, the Board's ruling poses a problem, for it is in tension with provisions of D.C. Law 13–160, the Omnibus Police Reform Amendment Act of 2000, that were enacted specifically to govern the retirement of police officers who are under disciplinary investigation.[33] Although these provisions were legislated by the Council years after the enactment of §§ 5–709 and 5–710, they have a significant bearing on our construction of those statutes. As the Supreme Court has explained, other acts often may elucidate or affect a statute's meaning, "particularly where [the legislature] has spoken subsequently and more specifically to the topic at hand."[34] Courts frequently

> interpret a statutory text in the light of surrounding texts that happen to have been subsequently enacted. This classic judicial task of reconciling many laws enacted over time, and getting them to "make sense" in combination, necessarily assumes that the implications of a

statute may be altered by the implications of a later statute.[35]

In D.C. Law 13–160, the Council provided for the completion of disciplinary investigations of members of the Metropolitan Police Department who retire or resign while under investigation for serious misconduct.[36] Such a member, who previously could avoid being disciplined by voluntarily retiring or resigning, now is deemed to be in "conditional retirement" until the investigation is concluded.[37] While he remains in that status, he "shall not be paid a pension or receive other accrued benefits of any kind, including salary."[38] The withholding of benefits is only temporary, however. If it is found that the conditionally retired member should be subjected to discipline for serious misconduct, that *does not* result in the loss of any retirement benefits the member is entitled to receive. Rather, the statute provides for the assessment of specified monetary penalties in lieu of the discipline that would have been imposed had the member not retired or resigned.[39] If the conditionally retired member would have been terminated, the monetary penalty may range from $1000

---

33. These provisions are codified in D.C.Code §§ 5–801 to 5–807.

34. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

35. *United States v. Fausto*, 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). This process of statutory reconciliation is entirely different, the Court emphasized, from "[r]epeal by implication of an express statutory text," which is "strongly disfavored." *Id.* at 452–53, 108 S.Ct. 668. It likewise is different from relying on statements in the legislative history of a later enactment to construe an earlier one. *See Doe v. Chao*, 540 U.S. 614, 626–27, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004) ("[S]ubsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its en-

actment.") (internal quotation marks omitted).

36. "Resignation" means "the voluntary separation of a member from the Metropolitan Police Department before the member's pension rights have accrued and vested." D.C.Code § 5–801(3). "Retirement" means the voluntary separation of such a member "after the member's pension rights, retirement pay, or other benefits have accrued and vested...." *Id.* § 5–801(4).

37. *Id.* § 5–803(a). The Department is required to complete the investigation within twenty-five days from the date on which the member retired or resigned. *Id.* § 5–803(c).

38. *Id.* § 5–803(b).

39. *Id.* §§ 5–803(f), 5–804.

to $5000.[40] The monetary penalty "shall be treated as a debt owed to the District of Columbia government and shall be deducted from the member's pension, retirement pay, or any other accrued benefits."[41]

Accordingly, if the Retirement and Relief Board had found O'Rourke eligible for retirement on disability *before* the Police Department concluded its disciplinary proceedings, he would have been entitled under the conditional retirement statute to receive a disability annuity (subject to the Department postponing the effective start of his retirement, finishing its investigation, and assessing the penalty imposed). It is hard to see why it should make a material difference that the disciplinary investigation happened to be concluded first. When retirement and disciplinary inquiries are proceeding contemporaneously on parallel tracks, it is illogical for a member's entitlement to a disability annuity to turn on irrelevant fortuities like the duration of the administrative or adjudicative processes in his particular matter—a factor that may vary greatly from case to case and that usually is outside the member's control.[42]

■ Still less would it be acceptable to construe the Retirement and Disability Act as granting the Board the discretion to manipulate outcomes by deliberately delaying its decisions on disability retirement applications when it learns that the applicant may be terminated.[43] The Board does not claim to have such discretion, and it denies having deliberately delayed ruling on O'Rourke's entitlement to a disability annuity in order to await the outcome of his disciplinary proceeding and thereby prevent him from taking conditional retirement. Nonetheless, at oral argument the Board's counsel suggested that such action would have been justified because the Board has a responsibility to protect the "integrity of the system" from an applicant seeking to capitalize on his fraud in obtaining his appointment to the Police force. This argument finds no support in the Retirement and Disability Act or our previous decisions. To the contrary, as this court has said, "it is not the province of the Retirement [and Relief] Board to exercise disciplinary functions."[44] Board proceedings are separate from and independent of departmental disciplinary proceedings and should not be entangled with them; indeed, we perceive no reason why the Board should be apprised of disciplinary proceedings that are unrelated to the factual issues before the Board. A deliberate decision by the Board to postpone its determination of a member's entitlement to a disability annuity pending the outcome of a disciplinary proceeding would thwart the conditional retirement scheme adopted by the Council, disregard the Board's statutory obligations to make a disability assessment (as set forth in §§ 5–709(c) and 5–710(e–1)), and arbitrarily deny or jeopardize the member's legal rights.

40. *Id.* § 5–804(c).

41. *Id.* § 5–805.

42. *See Ridge v. Police and Firefighters Ret. and Relief Bd.,* 511 A.2d 418, 426–27 (1986) (holding that when the Board restores disability payments to a temporarily ineligible annuitant, the effective date is when the annuitant became eligible again, not the later date on which the Board reached its decision).

43. *See id.* at 427 ("We search in vain for countervailing considerations which would support the Board's position that it may, in its discretion, withhold annuity payments falling due before the date of its reestablishment decision.... No legitimate interest of the Board is served by denying a reestablished annuitant entitlements backdated to the date of eligibility.").

44. *Allen v. D.C. Police and Firefighters' Ret. and Relief Bd.,* 560 A.2d 492, 501 (D.C.1989).

We therefore are compelled to conclude that the Board's restrictive interpretation of §§ 5–709 and 5–710 is at odds with the conditional retirement statute and the statutory framework as a whole. It would be "far more consistent" to include former members within the scope of the "members" who may be retired on disability under §§ 5–709 and 5–710.[45]

■ The Board's interpretation also conflicts with the primary purpose of the Retirement and Disability Act. That Act serves as the worker's compensation plan for the District's police and firefighters.[46] "As in the case of workers' compensation, those who apply for relief under the [Retirement and] Disability Act are assured of receiving 'adequate and certain compensation expeditiously and *without regard to fault.*' "[47] "Such remedial legislation is typically given liberal construction by the courts to effectuate its humanitarian purposes, with exemptions and exceptions narrowly construed and doubts resolved in favor of the employee."[48]

■ As a rule, and as we have held in construing the District of Columbia Workers' Compensation Act, the termination of an employee for reasons unrelated to his injury or claim does not disentitle the employee from receiving disability benefits. There is no reason why it should. In *Upchurch v. District of Columbia Depart-ment of Employment Services,*[49] where the employee initially was denied benefits after having been fired following his workplace injury, we stated:

> This court can find no authority, from any jurisdiction or legal treatise, which would support the proposition that termination severs the causal link between injury and wage loss. To the contrary, according to one of the leading authorities on workers' compensation law, the "[m]isconduct of the employee, whether negligent or wilful, is immaterial in compensation law, unless it takes the form of deviation from the course of employment, or unless it is of a kind specifically made a defense in the jurisdictions containing such a defense in their statutes." 2 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 32.00 (2001). If the Director did indeed consider the termination of the petitioner as a basis in law for denying benefits, such a determination would not withstand judicial scrutiny as it would find no support in the District of Columbia Workers' Compensation Act. Specifically, the Act does not provide that the subsequent termination of an employee, whether related or unrelated to a work injury, is a defense for an employer who denies an obligation to pay disability compensation.[50]

45. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 345, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

46. *Ray v. District of Columbia,* 535 A.2d 868, 871 (D.C.1987); *see also Lewis v. District of Columbia,* 499 A.2d 911, 913 (D.C.1985) (explaining that the Act "was promulgated to provide a compensation scheme for District of Columbia uniformed personnel, who were excluded from coverage under the statute generally applicable to other District of Columbia employees, the Federal Employees Compensation Act").

47. *Vargo v. Barry,* 667 A.2d 98, 101 (D.C. 1995) (quoting *Brown v. Jefferson,* 451 A.2d 74, 77 (D.C.1982)) (emphasis added). In exchange for that assurance, the remedies against the District provided by the Retirement and Disability Act to police and firefighters injured in the performance of their duties are exclusive. *Id.*

48. *Brown v. Jefferson,* 451 A.2d 74, 77 (D.C. 1982).

49. 783 A.2d 623 (D.C.2001).

50. *Id.* at 627 (citation omitted).

The general principle that an employee's termination is immaterial to his entitlement to workers' compensation benefits holds true even when the termination was for fraudulent or illegal activity, so long as " 'the illegal feature of the conduct was not the causative factor in producing the injury.' " [51] That the employee made false statements to his employer to obtain his job, and would not have been hired at all but for his fraud, is not enough to convert that fraud into a causative factor. To the contrary, we have held that fraud in securing employment, the conduct for which O'Rourke was terminated, ordinarily "does not foreclose [a] claim for benefits" under the Workers' Compensation Act.[52]

■ There are some exceptions to that usual rule, but the Board did not rely on them, and it appears that none of them apply here.[53] The only exception that we perceive as having potential relevance in this case concerns the particular nature of O'Rourke's alleged misrepresentations when he was hired. The Police Department terminated O'Rourke because it found that he falsely denied having been examined for any disease or physical impairment, when in fact he had been tested for a heart condition. Although this court has not·had occasion to address the question, other courts have held that an employee forfeits his claim for disability benefits if he lied about a pre-existing medical condition to which the claim is related.[54] So far as the record indicates, however, that is not the case here: There is no indication that the injuries O'Rourke sustained in chasing a carjacker were related in any way to the condition of his heart, or to anything else he allegedly hid from the Police Department when he was hired.[55] Nor did the Retirement and Relief Board base its decision in this case on that theory; the content of O'Rourke's alleged misrepresentations was irrelevant to the Board's ruling.

■ In sum, because the Retirement and Disability Act functions as a comprehensive workers' compensation statute for police and firefighters, it must be construed "liberally in light of its humane purpose." [56] In this case, the Board did not approach its interpretive task in that spirit. It overlooked the general rule that employees do not lose their rights to dis-

**51.** *Asylum Co. v. D.C. Dep't of Emp't Servs.*, 10 A.3d 619, 628 (D.C.2010) (quoting *Dowling v. Slotnik*, 244 Conn. 781, 712 A.2d 396, 412 (1998) (quoting 2 A. LARSON & L. LARSON, WORKERS' COMPENSATION § 35.20 (1997))).

**52.** *Asylum*, 10 A.3d at 628; *see also id.* at 628, 634 (holding that an unauthorized alien who used false documents to obtain his job is not precluded for that reason, or because his contract of employment violated federal immigration law, from pursuing a claim for workers' compensation benefits).

**53.** *Cf. Marboah v. Ackerman*, 877 A.2d 1052, 1059 (D.C.2005) (rejecting legal malpractice claim of unauthorized alien who obtained work and filed for Virginia workers' compensation benefits using another person's name and documents, because this fraud rendered him ineligible for those benefits under Virginia law).

**54.** *See, e.g., Dulin v. Levis Mitsubishi, Inc.*, 836 So.2d 340, 346 (La.Ct.App.2002) (employee held disqualified from receiving disability benefits in connection with his work-related back injury because the employee willfully concealed his history of back ailments from his employer when he answered a medical questionnaire at the time of hiring).

**55.** "Where there is no causal connection between the lie and the injury itself, the courts will generally look beyond the false statement and award compensation." 2 A. LARSON & L. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 39.03 (2011).

**56.** *Ridge v. Police and Firefighters Ret. and Relief Bd.*, 511 A.2d 418, 426 (D.C.1986).

ability benefits under workers' compensation statutes when their employment is terminated, even for wrongdoing. Its conclusion that a member becomes ineligible to receive a disability annuity under the Retirement and Disability Act if he happens to be terminated while the administrative process before the Board is still in progress is both anomalous and inconsistent with the Act's primary purpose.

■ We conclude that the Board has adopted an unreasonable interpretation of §§ 5–709 and 5–710, because it is incompatible with the broader statutory context and the humanitarian and remedial policy of the Act. As a result, we are not required to defer to it.[57] In essence, the Board asks us to "accord a narrow and grudging construction to remedial legislation,"[58] but it has provided us with no sound reason for doing so; and as we have done in the past, we decline to accept that invitation. There is no indication that the legislature, by vesting the Board with the authority to review disability retirement recommendations and applications, intended to do anything more than create a procedural pipeline through which the cases must pass. We therefore hold that membership at the time a recommendation or application for disability retirement reaches the Board is sufficient to satisfy the membership requirements of §§ 5–709 and 5–710, regardless of whether the member is terminated before the Board comes to its decision.[59] "[O]nce this necessary information has been submitted, there will be some administrative delay ...; its duration will depend upon the speed of the Board's internal adjudicative processes and will, presumably, vary from year to year and from annuitant to annuitant. [This delay does not result from] any fault of the annuitant...."[60] The Board must conduct its normal analysis to determine whether the member is, in fact, disabled, and whether that disability arose from the performance of duty. But the Board may not deny a disability annuity solely on the grounds that the member's employment was terminated while the matter was pending before it. The member's substantive entitlement cannot be beholden to administrative delays.

## IV.

For the foregoing reasons, we reverse the decision of the Retirement and Relief Board in this case and remand for further proceedings consistent with our opinion. On remand, the Board should determine whether O'Rourke is disabled within the meaning of the Retirement and Disability Act, and if so, whether his disability is performance-related and what disability annuity he is entitled to receive.

*So ordered.*

Opinion by Senior Judge SCHWELB, concurring in the judgment.

SCHWELB, Senior Judge, concurring in the judgment:

For several reasons set forth below, I find this case substantially more difficult than my colleagues in the majority do. Nevertheless, and especially in light of this court's decisions in *Upchurch v. District of Columbia Dep't of Employment Servs.*, 783 A.2d 623 (D.C.2001), and *Asylum Co. v. District of Columbia Dep't of Employment Servs.*, 10 A.3d 619 (D.C.2010), I

---

57. *Id.*

58. *District of Columbia v. Tarlosky*, 675 A.2d 77, 81 (D.C.1996).

59. We express no opinion as to whether, or under what circumstances, membership at an earlier point also may be sufficient.

60. *Ridge*, 511 A.2d at 426–27.

agree, albeit with a measure of reluctance, that the Board's decision should be reversed.

## I.

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *see also Chevron, U.S.A. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Howard Univ. Hosp. v. District of Columbia Dep't of Employment Servs.,* 952 A.2d 168, 173 (D.C.2008). To be sure, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Harris v. District of Columbia Office of Worker's Comp.,* 660 A.2d 404, 407 (D.C.1995) (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)); *see also United Parcel Serv. (UPS) v. District of Columbia Dep't of Employment Servs.,* 834 A.2d 868, 871 (D.C.2003). Nevertheless, in conformity with *Udall v. Tallman* and its progeny:

> We will defer to any agency's interpretation of a statute that it administers so long as it is not plainly wrong or inconsistent with the legislature's intent. *We must sustain the agency's interpretation even if a petitioner advances another reasonable interpretation of the statute or if we might have been persuaded by the alternate interpretation had we been construing the statute in the first instance.*

*Howard Univ. Hosp.,* 952 A.2d at 173–74 (emphasis added) (citations and internal quotation marks omitted). In other words, regardless of what our own view may be, we must sustain the Board's construction as long as it is reasonable and consistent with the language and history of the statute. *See Asylum,* 10 A.3d at 625.

Moreover, we have repeatedly held that "[t]he deference which courts owe to agency interpretations of statutes which they administer is, of course, at its zenith where the administrative construction has been consistent and of long standing." *Tenants of 738 Longfellow Street, N.W. v. District of Columbia Rental Hous. Comm'n,* 575 A.2d 1205, 1213 (D.C.1990); *accord, UPS,* 834 A.2d at 871; *Superior Beverages, Inc. v. District of Columbia Alcoholic Beverage Control Bd.,* 567 A.2d 1319, 1325 (D.C. 1989). In this case, as revealed in this court's unpublished Memorandum Opinion and Judgment (MOJ) in *Hart v. District of Columbia Police & Firefighters Relief & Ret. Bd.,* No. 96–AA–368 (D.C. Oct. 24, 1997), see maj. op., *ante,* at p. 383 n. 9, the Board has adhered to a construction of the statute which it has applied at least since January 1996, when it entered the order denying benefits to a former employee which this court affirmed in *Hart.* The apparent consistency of the Board's construction over a protracted period of time adds to the deference which we are obliged to accord it.

Finally, the question whether O'Rourke is entitled to retirement benefits is one within the specialized expertise of the Board. This case is unlike one in which we review a decision of the Office of Administrative Hearings, which "is vested with the responsibility for deciding administrative appeals involving a substantial number of different agencies," and cannot be expected to have specialized knowledge as to all of them. *Washington v. District of Columbia Dep't of Public Works,* 954 A.2d 945, 948 (D.C.2008). This is an additional reason for heightened deference here. *See also Udall,* 380 U.S. at 16, 85 S.Ct. 792.

My colleagues in the majority do not claim, nor can they, that there is "plain language" in the statute that ordains the result that they reach. The question before us is whether O'Rourke, who had become a former member of the Metropolitan Police Department (MPD) by the time the Board issued its decision, was nevertheless entitled to receive disability benefits. In my opinion, the language of the statute tends to support the Board's construction rather than the court's. I so conclude because the provisions here specifically at issue—D.C.Code §§ 5–709 and 5–710—provide relief to someone who is a "member," but they are silent as to the rights, if any, of a "former member." By contrast, as the majority acknowledges in footnote 30, *ante,* other provisions of the statute make explicit reference to "former members." *See* §§ 5–701(7); 5–701(3), (4); 5–716(b). Our legislators obviously knew how to say "former member" when that is what they meant. Therefore, to quote Justice Brandeis, O'Rourke is arguably seeking "an enlargement of [the statute] by the court, so that what was omitted, presumably by inadvertence, may be included within its scope." *Iselin v. United States,* 270 U.S. 245, 250–51, 46 S.Ct. 248, 70 L.Ed. 566 (1926); *see also Chase v. District of Columbia Alcoholic Beverage Control Bd.,* 669 A.2d 1264, 1268–69 (D.C. 1995) (quoting *Iselin* ). As the Court added in *Iselin,* however, "[t]o supply omissions transcends the judicial function." *Iselin,* 270 U.S. at 251, 46 S.Ct. 248. To insist that "members," in the present context, includes "former members" is to tread on perilous ground.

It is also my view that by dismissing the *Hart* MOJ in a footnote, *ante* n. 9, on the ground that an unpublished MOJ does not constitute binding precedent,[1] the majority overlooks an aspect of the issue before us

to which our unpublished decision in *Hart* is not irrelevant at all. Since we are required to sustain any reasonable interpretation by the Board of the statute that it administers, and since all three members of a division of this court (including the author of this opinion) upheld that interpretation in *Hart* on the ground that it is consistent with, and even compelled by, the language of the statute, this court should surely be a little cautious about dismissing that interpretation as unreasonable.

As I see it, there is nothing in the language of the statute that is more consistent with the majority's construction than with the Board's. There likewise appears to be no legislative history that addresses this specific issue. Although we are dealing here with remedial humanitarian legislation, and although O'Rourke's injuries in the line of duty (regardless of how he secured that duty) may generate some sympathy for his circumstances, I do not believe that these considerations dictate the result here. In light of the legislature's use of the phrase "former member" elsewhere in the statute, the apparent consistency over the years of the Board's construction, and our affirmance of that construction in *Hart,* I find it difficult indeed to conclude that the Board's ruling in this case was unreasonable. If reasonable people might either agree or disagree with the Board's interpretation, then we are ordinarily obliged to sustain it.

**II.**

There is an additional reason, not addressed by the parties, for my hesitation in joining the majority's disposition of this petition for review. For me, it is important that O'Rourke was not fired because he engaged in misconduct during his service as a member of the MPD. Rather, he

---

1. I cannot and do not quarrel with the proposition that an unpublished MOJ is not binding

on us, but I do not believe that this makes what we decided in *Hart* inconsequential.

was discharged because he engaged in fraud in the process of securing his MPD membership by lying about his medical history. Specifically, O'Rourke falsely denied in his application that he had undergone certain medical tests. It appears that if O'Rourke had told the truth instead of lying, he probably would not have become a District of Columbia police officer at all, and the question whether he is entitled to disability benefits would never have arisen.

The case thus arguably implicates "the maxim that no man may take advantage of his own wrong." *Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 232, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). This principle is "[d]eeply rooted in our jurisprudence," and it "has been applied in many diverse classes of cases by both law and equity courts." *Id.* at 232–33, 79 S.Ct. 760. Specifically, it has been invoked by this court in a case which has much in common with the present one.

In *Marboah v. Ackerman,* 877 A.2d 1052 (D.C.2005), the plaintiff had been injured in a work-related accident, and he had applied for workers' compensation. Because he was an illegal alien and was not eligible either to work in this country or to receive workers' compensation, he had used another man's name and social security card, both to secure employment and, following his accident, to apply for benefits. He subsequently sued his attorney for legal malpractice after the latter failed to file an action on Marboah's behalf to challenge the denial of benefits. Relying heavily on *Glus,* we affirmed the entry of judgment in favor of the attorney on the ground that Marboah's underlying claim for compensation benefits was lacking in merit. We held, in pertinent part:

> Any purported entitlement that Marboah could have had to workers' compen-

sation was founded upon misrepresentation and fraud as to his eligibility for compensation, and this court will not aid Marboah to vindicate that fraud-induced entitlement through this action for legal malpractice. Accordingly we decline to permit Marboah to recover, as damages from his attorneys, "lost" workers' compensation which the defendants' negligence allegedly prevented him from recovering, but to which in fact he was not legally entitled at all. If Marboah had not concealed the truth, *inter alia,* from his employer, from the employer's carrier, and from the defendants (who were his attorneys in the workers' compensation claim), his claim would never have been favorably considered, for as a matter of [Virginia] law, ... Marboah's status as an illegal alien would have disqualified him from any recovery.

*Marboah,* 877 A.2d at 1059.

Although there are significant differences between *Marboah* and this case, and although Marboah's fraud was far more extensive than O'Rourke's, there is also a fundamental similarity. Both men were injured on the job. Both men lied to obtain their employment. If either man had told the truth, he probably would not have obtained the job. Marboah was denied relief on account of his lies. O'Rourke asserts that he is entitled to compensation notwithstanding his lie. In my view, the *Glus* maxim should at least arguably have a role to play in deciding whether O'Rourke should be permitted to receive benefits when he apparently might not even have been working as a police officer if he had told the truth.[2]

### III.

Having voiced my reservations, however, I am unable to reconcile the agency's

---

2. I recognize, however, that the Board did not base its decision on *Glus,* or even on

decision with certain binding precedent cited by the majority. In particular, I note our ruling in *Upchurch* that

> [m]isconduct of the employee, whether negligent or willful, is immaterial in compensation law, unless it takes the form of deviation from the course of employment, or unless it is of a kind specifically made a defense in the jurisdictions containing such a defense in their statutes.

783 A.2d at 627 (quoting 2 ARTHUR LARSON, LARSON'S WORKERS' COMPENSATION LAW § 32.00 (2001)) (internal quotation marks omitted). If, as we held in *Upchurch*, an employee's misconduct is irrelevant, then the employer cannot be permitted to circumvent that rule by discharging the employee and then denying benefits on the grounds that the employee is no longer employed. The remedial humanitarian legislation here at issue surely "forecloses sophisticated as well as simple-minded modes of nullification or evasion." *Richman Towers Tenants' Ass'n v. Richman Towers, LLC,* 17 A.3d 590, 602 (D.C.2011) (internal quotation marks omitted); *see Lane v. Wilson,* 307 U.S. 268, 275, 59 S.Ct. 872, 83 L.Ed. 1281 (1939).

We have also held that the fact that a claimant secured his employment by fraud

likewise does not affect his right to receive disability benefits. In *Asylum,* 10 A.3d at 628, 630, this court held that an illegal alien who used false documents to obtain his job, and whose employment contravened our immigration statutes, was not precluded from pursuing a claim for workers' compensation benefits. Although there is arguably some tension between our decisions in *Marboah* and *Asylum,*[3] the present case is more like the latter than the former, because Marboah's employment was governed by Virginia law, which rendered him ineligible for benefits, while the claimants in *Asylum* and *O'Rourke* were employed in the District of Columbia, where no statute or judicial ruling so provides. Moreover, as I have previously acknowledged, the Board did not decide this case under a *Glus* theory, nor did it differentiate between former members who obtained their positions by fraud and other former members. Accordingly, and notwithstanding the reservations expressed in this opinion, I concur in the judgment of the court.

O'Rourke's deception, but rather on the fact that at the time of its decision, O'Rourke was a former member. We are not free to affirm an agency's discretionary decision on grounds different from those relied on by the agency. *See, e.g., Cooper v. District of Columbia Dep't of Employment Servs.,* 588 A.2d 1172, 1176 (D.C.1991).

3. In *Asylum,* 10 A.3d at 627 n. 10, this court distinguished *Marboah* principally on the ground that Marboah "was ineligible under then-current Virginia law to recover workers' compensation," while the claimant in *Asylum* applied in the District, where there was no comparable explicit bar to recovery. As the author of the court's opinion in *Marboah,* I question whether the result would have been different had the case arisen in the District,

for our reasoning was dominated by the *Glus* maxim. When there is a conflict between two of our decisions, we have held that

> [w]here a division of this court fails to adhere to earlier controlling authority, we are required to follow the earlier decision rather than the later one.

*Sutton v. United States,* 988 A.2d 478, 482 (D.C.2010) (quoting *Thomas v. United States,* 731 A.2d 415, 420 n. 6 (D.C.1999)); *see M. A. P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971). Because *Asylum* can be distinguished from *Marboah,* however; because this case falls on the *Asylum* side of the distinctions; and because the Board did not rely on the *Glus* maxim, I prefer not to open a Pandora's box by addressing the question whether the two decisions are consistent.