*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CV-1222

AMERICAN STUDIES ASSOCIATION, ET AL., APPELLANTS,

V.

SIMON BRONNER, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-1712-19)

(Hon. Robert R. Rigsby, Trial Judge)

(Argued May 11, 2021                    Decided September 30, 2021)

*Thomas C. Mugavero* for appellants the American Studies Association, Duggan, Marez, Tadiar, Maira, Reddy, and Stephens.

*Maria C. Lahood*, with whom *Astha Sharma Pokharel* and *Shayana D. Kadidal* were on the brief, for appellant Salaita.

*Mark Kleiman* for appellant Puar.

*Jerome M. Marcus*, with whom *Jennifer Gross*, *Joel Friedlander*, and *Eric D. Roiter* were on the brief, for appellees.

*Radhika Sainath*, in support of appellants, for amicus curiae Palestine Legal.

*Laura C. Regan*, *Marco Simons*, and *Rebecca Chapman*, in support of appellants, for amicus curiae Members of the "Protect the Protest" Task Force.

*Baruch Weiss* and *Graham W. White*, in support of appellees, for amicus curiae Scholars for Peace in the Middle East.

*Don Padou*, amicus, in support of neither side.

Before GLICKMAN, EASTERLY, and DEAHL, *Associate Judges*.

GLICKMAN, *Associate Judge*: This interlocutory appeal is from the Superior Court's denial of a "special motion to dismiss" under the Anti-Strategic Lawsuits Against Public Participation ("Anti-SLAPP") Act.[1] The appeal requires us to construe certain of the statutory requirements governing such motions.

Broadly speaking, the term SLAPP is used to refer to "an action filed by one side of a political or public policy debate aimed to punish or prevent opposing points of view."[2] The Anti-SLAPP Act provides procedural mechanisms to thwart such suits. One of those mechanisms is a special motion to dismiss SLAPP claims with prejudice at the outset of the litigation with minimal or no discovery, "as soon as practicable" after an expedited hearing.[3] If the trial court grants the motion, it may award the costs of litigation, including reasonable attorney fees, to the movant.[4]

---

[1] D.C. Code §§ 16-5501 to -5505 (2012 Repl.).

[2] *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016) (quoting Council of the District of Columbia, Report of Committee on Public Safety and the Judiciary on Bill 18-893, at 1 (Nov. 18, 2010) ("2010 Committee Report")).

[3] *See* D.C. Code § 16-5502(c), (d).

[4] *Id.* § 16-5504(a).

The Anti-SLAPP Act specifies the showing each party must make in the litigation of a special motion to dismiss. The initial burden is on the movant to "make[] a prima facie showing that the claim at issue *arises from* an act in furtherance of the right of advocacy on issues of public interest."[5] The burden then shifts to the responding party to "demonstrate[] that the claim is *likely to succeed on the merits*."[6] The disputed issues in this appeal concern the interpretation of the italicized words ("arises from" and "likely to succeed on the merits") and whether the parties shouldered their respective burdens.

Appellant American Studies Association ("ASA") is a non-profit research organization. In 2013, it formally adopted a resolution endorsing a boycott of Israeli academic institutions ("2013 Resolution"). Appellees were ASA members at or around that time. They filed the instant lawsuit in Superior Court against the ASA and several of its officers, directors, and other members (who now are appellants along with the ASA). In the interest of clarity, we shall frequently refer to appellants

---

[5] *Id.* § 16-5502(b) (emphasis added). As we will discuss below, the term "act in furtherance of the right of advocacy on issues of public interest" is defined by the Anti-SLAPP Act to mean certain categories of public speech or expression. *See id.* § 16-5501(1).

[6] *Id*. § 16-5502(b) (emphasis added).

in this opinion as the "ASA defendants" (or just as the "defendants"); and we shall refer to appellees as the "plaintiffs."

The twelve-count complaint alleged various breaches of fiduciary duty, as well as breaches of contract, tortious interference with contract, corporate waste, and violations of the District's Nonprofit Corporation Act.[7]  The ASA defendants responded to the complaint by filing a motion to dismiss pursuant to Superior Court Civil Rule 12(b)(6) for failure to state claims upon which relief can be granted, and a special anti-SLAPP motion to dismiss the lawsuit.  In their 12(b)(6) motion, the defendants argued that plaintiffs' claims were time-barred, as well as precluded or deficient for other reasons.  In their anti-SLAPP motion, the defendants argued that all the plaintiffs' claims "arise, in one way or another" from the ASA's 2013 Resolution, which was an "act in furtherance of the right of advocacy on issues of public interest."

Plaintiffs contested both motions.  In response to the anti-SLAPP motion, they argued that their claims did not "arise from" protected activity, but rather from "specific non-speech acts that violated [d]efendants' obligations to the ASA and its

---

[7]  D.C. Code §§ 29-401.01 to -414.04 (2013 Repl.).

members, under principles of corporate, tort and contract law." Plaintiffs also argued that their claims were not barred or defective and were likely to succeed on the merits.

The trial court granted the 12(b)(6) motion in part. It ruled that several counts of the complaint were time-barred in whole or part but that the remaining counts were not subject to dismissal for failure to state a claim on which relief could be granted. The court denied the special motion to dismiss. It concluded the defendants had made the necessary prima facie showing that the plaintiffs' claims arose from acts in furtherance of the right of advocacy, inasmuch as the claims all challenged actions that were related in some way to the 2013 Resolution. Nonetheless, the court also concluded that this fact did not entitle the defendants to relief under the Anti-SLAPP Act because the plaintiffs had "demonstrated that a number of their claims have merit."

In the present interlocutory appeal, the ASA defendants ask us to reverse the denial of their special motion to dismiss. They do not appeal the partial denial of their 12(b)(6) motion.[8]

---

[8] *Compare Mann*, 150 A.3d at 1231 (holding that trial court's denial of an anti-SLAPP motion to dismiss is immediately appealable under the collateral order doctrine), *with District of Columbia v. Pizzulli*, 917 A.2d 620, 624 (D.C. 2007)

The ASA defendants argue that the trial court should have granted their anti-SLAPP motion to dismiss the counts that fail to state a claim for relief because for that very reason those counts are *not* "likely to succeed on the merits." As to the remaining counts of the complaint, the ASA defendants argue that the court erred in failing to assess the likelihood of success of each claim individually and in merely concluding that a number of the claims had merit. In response, the plaintiffs argue that the standard for dismissal under Rule 12(b)(6) is "unrelated" to the anti-SLAPP standard of likelihood of success on the merits, and that all their claims are sufficiently meritorious to meet that standard. In the alternative, plaintiffs argue that the special motion to dismiss was properly denied because their claims do not "arise from acts in furtherance of public advocacy" of the ASA defendants within the meaning of the Anti-SLAPP Act.

We hold that a claim is not "likely to succeed on the merits" within the meaning of the Anti-SLAPP Act if the claim is subject to dismissal under Rule 12(b)(6), and we agree with the defendants that the court was required to determine likelihood of success on a claim-by-claim basis. We further hold that for a claim to "arise from" an act in furtherance of public advocacy, a party's statutorily protected

---

("[A]n order denying a motion to dismiss — typically a non-final order — is not immediately appealable.").

activity must itself be the basis for that party's asserted liability. In consequence of these holdings, we vacate the denial of the special motion to dismiss and remand the case to the Superior Court for further proceedings consistent with this opinion.

## I. Background

### A. The Parties

Appellant ASA is a non-profit organization, founded in 1951, that promotes "the study of American culture through the encouragement of research, teaching, [and] publication," as well as "the strengthening of relations among persons and institutions in this country and abroad devoted to such studies." The ASA has been incorporated in the District under the Nonprofit Corporation Act since 1971.

In 2013, the ASA had approximately 3,800 members. Regular ASA members were required to pay dues in yearly installments. Members whose dues were six months in arrears would be dropped from the rolls, but they could be "reinstated at any time by the payment in advance of one year's dues." The ASA's constitution also provided for honorary members, who were exempt from paying dues. All ASA members in good standing enjoyed "the right to vote and hold office in the association."

The ASA's leadership was made up of five officers: the president, the vice-president, the executive director, the editor of the *American Quarterly* journal, and the editor of the Encyclopedia of American Studies ("the Encyclopedia"). The president and the vice-president were elected; the other three officers were appointed. All five officers were members of the ASA's board of directors, called the National Council, but the appointed officers were non-voting (*ex officio*) members. An Executive Committee implemented the National Council's directives.

The ASA maintained a "Trust and Development Fund . . . to insure [sic] the long-term financial stability of the association." The ASA's constitution provided that the Fund "may also from time to time make grants in support of the projects, activities, or prizes of the association." Withdrawals from the Fund were conditioned on "the request of at least two-thirds of the voting members of the [National] Council approved by at least four members of the Board of Trustees." The Board of Trustees consisted of the ASA vice-president and four members appointed by the ASA president "with the advice and consent" of the National Council. The trustees were required to "direct the investment of the Fund's resources in a fiscally sound and socially responsible manner."

Except for appellant Steven Salaita, who did not join the ASA's National Council until 2015, the individual appellants all were ASA members in 2013. At times relevant to the instant lawsuit, appellants Curtis Marez, Lisa Duggan, Sunaina Maira, Kehaulani Kauanui, Chandan Reddy, and John Stephens were ASA officers or held positions on the National Council and/or the Executive Committee.[9] Appellants Neferti Tadiar and Jasbir Puar served on committees within the ASA.[10]

Several of the individual appellants also were involved with the United States Association for the Academic and Cultural Boycott of Israel ("USACBI").[11] USACBI was founded in 2009 as part of the larger "Boycott, Divestment, Sanctions" Movement, commonly known by the acronym BDS. It lobbies organizations to boycott Israeli academic and cultural institutions as a form of protest against the state's treatment of Palestinians.

Appellee Simon Bronner is a professor of American Studies, an honorary ASA member, and a former editor of the Encyclopedia. In the latter capacity he was

---

[9] Ms. Duggan succeeded Mr. Marez as ASA president in July 2014.

[10] No member of the Board of Trustees was named in the complaint as a defendant.

[11] The complaint identifies these appellants as Ms. Tadiar, Ms. Maira, Ms. Kauanui, Ms. Puar, and Mr. Salaita.

also an *ex officio* member of the National Council. Mr. Bronner's editorial contract with the ASA expired on December 31, 2016, and it was not renewed. Mr. Bronner's co-plaintiffs, appellees Michael Rockland, Charles Kupfer, and Michael Barton, were ASA members in or around 2013.[12] Mr. Barton had allowed his membership to lapse for about a year beginning in 2012.

## B. The 2013 Resolution

On November 25, 2013, the National Council approved the submission of a proposed resolution to the ASA membership for a vote. The resolution was entitled "Boycott of Israeli Academic Institutions." Its operative language read:

> It is resolved that the American Studies Association (ASA) endorses and will honor the call of Palestinian civil society for the boycott of Israeli academic institutions. It is also resolved that the ASA supports the protected rights of students and scholars everywhere to engage in research and public speaking about Israel-Palestine and in support of the boycott, divestment, and sanctions (BDS) movement.[13]

---

[12] Mr. Rockland was an honorary member, while Mr. Kupfer and Mr. Barton were regular members.

[13] *Boycott of Israeli Academic Institutions*, AMERICAN STUDIES ASSOCIATION (Dec. 4, 2013), https://www.theasa.net/about/advocacy/resolutions-actions/resolutions/boycott-israeli-academic-institutions; https://perma.cc/PX3D-8QRD.

That same day, the National Council instructed Mr. Stephens, the ASA's executive director, to freeze the membership rolls of the ASA for twenty days. This action prevented members whose dues were in arrears from being reinstated and becoming eligible to vote during the ten-day voting period on the resolution. One such member was Mr. Barton, who was unable to vote on the 2013 Resolution due to the freeze.

The resolution was adopted on December 4, 2013. Out of 3,865 eligible ASA members, 1,252 cast votes, with 827 in favor.

### C. Mr. Bronner's Editorial Contract

Mr. Bronner took over as the editor of the Encyclopedia in 2011. The ASA paid him a yearly stipend of $8,500 for his services. Mr. Bronner's five-year term as editor was set to expire on December 31, 2016. In May 2015, appellant Duggan (then the ASA president) contacted Mr. Bronner to inform him that the Executive Committee was "finalizing a call for proposals" for a new editor of the Encyclopedia, and that this process would "very definitely include[] soliciting [him] for another term." Mr. Bronner alleges that the Executive Committee never carried out this open call for nominees; instead, he alleges, the Executive Committee privately offered the editor's position to Sharon Holland, a member of the National Council.

The ASA announced that Ms. Holland would be the new editor of the Encyclopedia in January 2017, after Mr. Bronner's contract expired. The plaintiffs allege that Mr. Bronner was effectively pushed out of the ASA and denied reappointment as the editor of the Encyclopedia because of his opposition to the 2013 Resolution, that no work has been done on the Encyclopedia since his term expired, and that his nominal successor, Ms. Holland, has not been paid the editor's stipend.

## D. The Federal Lawsuit

Mr. Bronner and his co-plaintiffs initially filed a lawsuit against appellees in the United States District Court for the District of Columbia, charging them with breaches of fiduciary duty, breach of contract, corporate waste, and violations of the Nonprofit Corporation Act. The District Court summarized the plaintiffs' allegations as follows:

> Plaintiffs allege that the Individual Defendants engaged in improper conduct, in contravention of their duties to the ASA and its members, and in violation of the ASA's bylaws and D.C. law, to ensure that the [2013] Resolution was formally endorsed by the ASA. They also allege that the Individual Defendants improperly utilized ASA funds to defend the [2013] Resolution after its passage.

Additionally, Plaintiffs allege . . . that, since the Resolution, several members of the ASA have resigned in protest, depriving the ASA of membership dues[,] . . . that the ASA has experienced reputational harm because of the reaction to the Resolution by the academic community and the general public[,] . . . [and] that the ASA has suffered financial harm because of an alleged decrease in donations and an increase in public-relations and legal spending in response to the public backlash resulting from the Resolution.[14]

In March 2017, the District Court dismissed the plaintiffs' derivative claims because they had not complied with the notice and demand requirements of the Nonprofit Corporation Act.[15]  Thereafter, in February 2019, the District Court dismissed the entire case because plaintiffs could not meet the $75,000 amount in controversy threshold necessary for diversity jurisdiction.[16]  The D.C. Circuit affirmed this ruling.[17]

---

[14] *Bronner v. Duggan*, 317 F. Supp. 3d 284, 287 (D.D.C. 2018) (*Bronner II*).

[15] *Bronner v. Duggan*, 249 F. Supp. 3d 27, 44–47 (D.D.C. 2017) (*Bronner I*). *See* D.C. Code § 29-411.03(2) (2013 Repl.).

[16] *Bronner v. Duggan*, 364 F. Supp. 3d 9, 23 (D.D.C. 2019) (*Bronner III*); *see also* 28 U.S.C. § 1332(a).

[17] *Bronner v. Duggan*, 962 F.3d 596 (D.C. Cir. 2020) (*Bronner IV*).

## E. The Superior Court Proceedings

On March 15, 2019, appellees filed a 117-page, twelve-count complaint against the ASA and the individual ASA defendants in Superior Court. On behalf of all the plaintiffs, the complaint asserted eight counts alleging breaches of fiduciary duties (counts one and two); ultra vires acts and breach of contract (counts three through six); violations of the Nonprofit Corporation Act (count seven); and corporate waste (count nine). On behalf of Mr. Bronner alone, the complaint also asserted four counts for breach of his editorial contract (count eight), breach of fiduciary duties (count ten), tortious interference with contract (count eleven), and aiding and abetting breach of fiduciary duty (count twelve).[18] The complaint sought both monetary damages and injunctive and declaratory relief.

The defendants filed Rule 12(b)(6) and anti-SLAPP motions to dismiss. In their 12(b)(6) motions, they argued that plaintiffs' claims were: (1) outside the statute of limitations, (2) derivative, and therefore collaterally estopped following

---

[18] Only counts three, four, five, nine, and ten were directed against all of the defendants. Counts one, two, and eleven were directed against the individual defendants only, while only the ASA was named as a defendant in counts six, seven, and eight. Count twelve named a subset of the individual defendants (Ms. Maira, Ms. Kauanui, Ms. Puar, Mr. Stephens and Mr. Salaita).

the district court decision in *Bronner I*, (3) precluded by the immunity from suit bestowed by the federal Volunteer Protection Act,[19] and/or (4) otherwise insufficient as a matter of law.[20] In their anti-SLAPP motion, the defendants contended that "all the [appellees'] claims . . . arise in one way or another from the ASA's decision to endorse the Academic Boycott and communicative actions related to that decision." Plaintiffs opposed the motions.

After a hearing, the court partially granted defendants' 12(b)(6) motion to dismiss and denied their anti-SLAPP motion to dismiss. Dealing first with the 12(b)(6) motion, the court ruled that counts three through eight and parts of counts two and nine were time-barred. The court rejected the other grounds on which the defendants sought dismissal for failure to state a claim.[21] Thus, the non-time-barred claims asserted in six counts of the complaint survived the 12(b)(6) motion.

---

[19] 42 U.S.C. § 14053.

[20] Specifically, defendants argued that plaintiffs had not identified any ultra vires acts, that Mr. Bronner had no legitimate expectation that his editorial contract would be renewed, and that the District does not recognize a cause of action for aiding and abetting breach of fiduciary duty.

[21] The court was not persuaded that the non-time barred claims were derivative or collaterally estopped for that reason, concluded that the defendants did not benefit from immunity under the Volunteer Protection Act, and ruled that the claims adequately stated claims for relief. These rulings are not before us for review in this appeal.

Turning to the special motion to dismiss, the court found that defendants had made the prima facie showing required to meet their initial burden. It reasoned that "[t]he 2013 resolution and associated acts constitute a communication of views to members of the public" concerning "an issue of public interest . . . related to community well-being," namely "the ability of foreign scholars to work on relevant issues safely, freely, and without fear of persecution." But the court also ruled that plaintiffs had met their burden of demonstrating a likelihood of success on the merits:

> Plaintiffs have demonstrated that a number of their claims have merit. Plaintiffs have successfully demonstrated that they have evidence suggesting that there may have been a breach of fiduciary duty and that the resolution was improperly passed, costing [sic; causing?] the ASA to lose membership and funds. The court is thus persuaded that these claims do not need to be dismissed pursuant to the Anti-SLAPP Act.

The court did not evaluate the plaintiffs' likelihood of success on a claim-by-claim basis. It did not further explain why it was "not presently persuaded that the Plaintiffs are so unlikely to win on the merits of their claims that this Complaint should be barred by the Anti-SLAPP Act."

The ASA defendants immediately appealed the denial of their anti-SLAPP motion to dismiss.

## II. Discussion

Appellate review of the denial of a special motion to dismiss under the Anti-SLAPP Act is de novo.[22] Appellants, the ASA defendants, challenge the ruling that plaintiffs demonstrated the requisite likelihood of success on the merits. The defendants' principal argument is that, at a minimum, the Superior Court should have granted the special motion with respect to the time-barred claims because plaintiffs (appellees) could not show those claims were likely to succeed on the merits. Plaintiffs dispute this point and defend the lower court's ruling. We shall address appellants' contentions first. We will then consider plaintiffs' alternative argument for affirmance: that the Superior Court erred in finding the defendants carried their initial burden of showing that the plaintiffs' claims arose from an act in furtherance of the right of advocacy.

---

[22] *Close It! Title Servs., Inc. v. Nadel*, 248 A.3d 132, 138–39 (D.C. 2021).

## A. Likelihood of Success on the Merits

## 1. The Statutory Requirement

"The D.C. Anti-SLAPP Act provides a party defending against a SLAPP with procedural tools to protect themselves from 'meritless' litigation."[23] One such tool is the special motion to dismiss, which places the burden on the nonmoving party to show that its claims arising out of acts in furtherance of the right of advocacy on issues of public interest are "likely to succeed on the merits."[24] The Anti-SLAPP Act does not define the phrase "likely to succeed on the merits," nor any of its components.

This court confronted the question of how to interpret the Anti-SLAPP Act's likelihood of success requirement in *Competitive Enterprise Institute v. Mann*. *Mann* involved claims for libel and intentional infliction of emotional distress that were based on articles the defendants had written or published about the plaintiff's

---

[23] *Saudi American Pub. Rels. Affs. Comm. v. Inst. for Gulf Affs.*, 242 A.3d 602, 605 (D.C. 2020) (quoting *Mann*, 150 A.3d at 1226–27).

[24] D.C. Code § 16-5502 (b).

scientific work on climate change.[25]  It was conceded that the plaintiff had "made the requisite prima facie showing that the [Anti-SLAPP] Act applie[d]."[26]  At issue was whether the plaintiff's claims were likely to succeed on the merits.[27]

The *Mann* court acknowledged that the Anti-SLAPP Act's text was ambiguous in at least one respect: "Although we can be confident that 'on the merits' refers to success on the substance of the claim," the court said, "the meaning of the requirement that the opponent 'demonstrate[] that the claim is likely to succeed' is more elusive."[28]  Without being able to rely on "a statutory . . . [or] clear dictionary definition,"[29] the court looked to legislative history and the goals of the special motion to dismiss:

> The special motion to dismiss is a mechanism by which a SLAPP defendant can 'expeditiously and economically dispense of [*sic*] litigation' to alleviate the burdens and cost of defending against a suit that is filed, not to succeed, but to 'prevent or punish' the defendant's speech or advocacy. . . . In short, . . . [it] authorizes final disposition of a claim in a truncated proceeding, usually without the benefit of discovery, to avoid the toll that meritless

---

[25]  *Mann*, 150 A.3d at 1220.

[26]  *Id.* at 1227.

[27]  *Id.*

[28]  *Id.* at 1233.

[29]  *Id.* at 1235.

litigation imposes on a defendant who has made a prima facie showing that the claim arises from advocacy on issues of public interest.[30]

The *Mann* court undertook to construe the phrase "likely to succeed on the merits" in light of the Act's goals, but also "in a manner that does not supplant the role of the fact-finder" and "respects the right to a jury trial."[31]  Adopting a standard akin to that used in evaluating summary judgment motions, the court concluded that, when evaluating the likelihood of success on the merits, the "precise question the [trial] court must ask . . . is whether a jury properly instructed on the law, including any applicable heightened fault and proof requirements, could reasonably find for the claimant on the evidence presented."[32]  Dismissal is appropriate, the court said, "only if the court can conclude that the claimant could not prevail *as a matter of law*, that is, after allowing for the weighing of evidence and permissible inferences by the jury."[33]  The "standards against which the court must assess the legal sufficiency of

---

[30]  *Id.* at 1235 (internal citations omitted).

[31]  *Id.* at 1236.

[32]  *Id.* at 1236.

[33]  *Id.* (emphasis in the original).

the evidence are . . . [those] that apply to the underlying claim *and related defenses and privileges*."[34]

*Mann* touched on the potential overlap between the "likely to succeed on the merits" standard of the Anti-SLAPP Act and the grounds for dismissal under Rule 12(b)(6). The court observed that "unless something more than argument based on allegations in the complaint is required, the special motion to dismiss would be redundant in light of the general availability, in all civil proceedings . . . of motions to dismiss under Rule 12(b)(6)."[35] The requisite "something more" is a proffer of admissible, credible evidence. A plaintiff must make more of a showing to defeat an anti-SLAPP motion than is ordinarily required to defeat a 12(b)(6) motion; by itself, the facial validity of a claim is not normally sufficient to demonstrate the likelihood of success required by the Anti-SLAPP Act. That demonstration requires the plaintiff to make, and the court to evaluate, a proffer of evidence supporting the well-pled claim and overcoming any defenses asserted against it. A plaintiff unable to make a satisfactory evidentiary proffer will face dismissal and a potential award

---

[34] *Id.* (emphasis added).

[35] *Id.* at 1233; *see also id.* at 1238 ("Our interpretation of the . . . standard applicable to special motions to dismiss ensures that the Anti-SLAPP Act provision is not redundant relative to the rules of civil procedure.").

of attorney's fees and costs to the defendant.[36]  Thus, the special motion to dismiss is not "redundant" of Rule 12(b)(6), because the special motion to dismiss can be granted even if the 12(b)(6) motion is denied.

*Mann* did not explicitly address the opposite question that is before us now — whether a plaintiff's failure to state a claim upon which relief may be granted is not only a ground for *granting* a 12(b)(6) motion but is also a sufficient ground for granting an anti-SLAPP motion as well.  The implication of its redundancy analysis, however, is that if the plaintiff is unable even to state a claim upon which relief can be granted, it follows automatically that the plaintiff is unable to demonstrate the claim is "likely to succeed on the merits" as required by D.C. Code §16-5502(b).

## 2. Effect of Failure to State a Claim on Which Relief May Be Granted

Appellees resist that conclusion.  They argue that the Rule 12(b)(6) standard and the §16-5502(b) standard are unrelated, because "[t]he Rule 12(b)(6) inquiry goes to whether the allegations in the complaint state a claim . . . [and] may include procedural and other issues that are purely legal (as opposed to factual)," while the anti-SLAPP inquiry (supposedly) "looks only at the quantum of evidence proffered

---

[36]  § 16-5504(a).

by the plaintiff." At first glance, this position may appear to align with *Mann*, which construed a likelihood of success on the merits to mean that "a jury properly instructed on the law . . . could reasonably find for the claimant *on the evidence presented*."[37]

Appellees' argument, however, is unpersuasive. The anti-SLAPP special motion to dismiss is essentially an expedited summary judgment motion, albeit with procedural differences,[38] and summary judgment is appropriate when a claim is legally insufficient for any reason, including the defenses that may be raised against it.[39] Thus, *Mann* recognized explicitly that a court evaluating a claimant's chances

---

[37] *Mann*, 150 A.3d at 1236 (emphasis added); *see also Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 506 (D.C. 2020) ("The standards for adjudicating a special motion to dismiss and a Rule 12(b)(6) motion are materially distinct.").

[38] As noted in *Mann*,

> [T]he special motion to dismiss is different from summary judgment in that it imposes the burden on plaintiffs and requires the court to consider the legal sufficiency of the evidence presented before discovery is completed. As concerns the standard to be employed by the court in deciding whether to grant the motion, however, the question is substantively the same: whether the evidence suffices to permit a jury to find for the plaintiff.

*Mann*, 150 A.3d at 1238 n.32.

[39] *See Paul v. Howard Univ.*, 754 A.2d 297, 310–12 (D.C. 2000) (affirming grant of summary judgment by trial court on the ground that plaintiff's claims were

of success on the merits must take into account not just "the underlying claim [but also] related defenses and privileges."[40]  The anti-SLAPP "process in essence accelerates the consideration of available defenses."[41]  These include defenses like the statute of limitations that may be asserted in 12(b)(6) motions.[42]  Simply put, regardless of the particular defense or other reason, when no relief can be granted on a claim as a matter of law, the claim is not "likely to succeed on the merits" because it legally *cannot* succeed on the merits.  No matter what evidence is or could be marshaled in support of such a claim, or how the jury might view that evidence, a "properly instructed" jury will not be able to return a plaintiff's verdict.[43]  Moreover,

---

time-barred); *Santos v. George Washington Univ. Hosp.*, 980 A.2d 1070, 1081 (D.C. 2009) (same); *Ward v. Wells Fargo Bank, N.A.*, 89 A.3d 115, 127–28 (D.C. 2014) (same, because plaintiff's claims were judicially estopped);

[40]  *Mann*, 150 A.3d at 1236.

[41]  *Fridman*, 229 A.3d at 506.

[42]  *See Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1020 (D.C. 2013); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed.) ("A complaint showing that the governing statute of limitations has run on the plaintiff's claim for relief is the most common situation in which [an] affirmative defense . . . provides a basis for a motion to dismiss under Rule 12(b)(6)") (collecting cases).  We note that the ASA defendants' other defenses were also permissibly asserted by 12(b)(6) motion; *see, e.g.*, *Walker v. FedEx Off. & Print Servs., Inc.*, 123 A.3d 160, 164 (D.C. 2015) (collateral estoppel and res judicata); *Moss v. Stockard*, 580 A.2d 1011, 1020 n. 18. (D.C. 1990) (immunity).

[43]  Wright & Miller, *supra* note 42, at §1357 ("[W]hen the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief . . . dismissal is justified because the allegations of the complaint

it would hardly be in keeping with the objective of the Anti-SLAPP Act — "to alleviate the burdens and costs of defending against a suit that is filed, not to succeed, but to prevent or punish the defendant's speech or advocacy"[44] — if trial courts were required to ignore any fatal legal deficiencies of the plaintiff's claims and keep them alive merely so that they could be dismissed later under Rule 12(b)(6). We therefore hold that where the court grants a 12(b)(6) motion because no relief can be granted on a claim as a matter of law, the plaintiff cannot show a likelihood of success on the merits of that claim for the purposes of the anti-SLAPP motion.

Courts in other jurisdictions have reached the same conclusion in interpreting similar anti-SLAPP laws. In *Phoenix Trading Inc. v. Loops LLC*, the Ninth Circuit reviewed the denial of a special motion to strike under Washington's anti-SLAPP statute, which provided that "the responding party must establish, by clear and convincing evidence, a likelihood of success on the merits" to defeat the motion.[45]

---

itself clearly demonstrate that *whatever interpretation is given to the facts the plaintiff does not have a claim that is legally redressible*.") (emphasis added).

[44] *Mann*, 150 A.3d at 1235 (internal quotation marks omitted).

[45] 732 F.3d 936, 941 (9th Cir. 2013) (citing Wash. Rev. Code Ann. § 4.24.525 (West 2010)). This statute was repealed in May 2021, when Washington became the first state to enact the Uniform Public Expression Protection Act ("UPEPA"). *See* 2021 Wash. Leg. Serv. Ch. 259. Section 7(1)(c)(ii)(A) of UPEPA expressly adopts the Rule 12(b)(6) standard, providing that a special motion to dismiss is appropriate if the moving party can show that the "responding party failed to state a

The appellate court affirmed the district court's ruling that the plaintiff had not met this standard because some of its claims were time-barred under the statute of limitations.[46] California courts have similarly held that a SLAPP has no probability of success on the merits — "a probability that the plaintiff will prevail on the claim"[47] — where it is time-barred,[48] collaterally estopped,[49] or covered by an absolute litigation privilege.[50] As the Ninth Circuit explained in *Hilton v. Hallmark*

---

cause of action upon which relief can be granted." *Id.* The official comments to UPEPA add that such a dismissal is warranted for "a claim that is barred by res judicata, or preempted by some other law," and "if a cause of action, while perhaps factually viable, is time-barred by the statute of limitations." Uniform Public Expression Protection Act, National Conference of Commissioners on Uniform State Laws (2020), at 4, 19–20, available at https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=d446fed6-3338-8b26-555f-9a4ab2ff4c56&forceDialog=0; https://perma.cc/EHJ2-8568. The UPEPA thus aligns with our thinking in this case.

[46] 732 F.3d at 944.

[47] Cal. Civ. Pro. Code § 425.16(b)(1) (West 2015).

[48] *Garcia v. Rosenberg*, 255 Cal. Rptr. 3d 377, 384 (Cal. Ct. App. 2019).

[49] *Supershuttle Int'l, Inc. v. Lab. & Workforce Dev. Agency*, 253 Cal. Rptr. 3d 666, 676 (Cal. Ct. App. 2019) ("[T]he question whether [a prior judgment] should be accorded collateral estoppel effect . . . is relevant to the second step of the anti-SLAPP analysis, plaintiff's likelihood of success on the merits.").

[50] *Laker v. Bd. of Trs. of Cal. State Univ.*, 244 Cal. Rptr. 3d 238, 259 (Cal. Ct. App. 2019); *see also RCO Legal, P.S., Inc. v. Johnson*, 820 S.E.2d 491, 498 n.10, 500 (Ga. Ct. App. 2018) (stating that to establish a probability of prevailing on the merits under Georgia's anti-SLAPP law, the plaintiff "must state and substantiate a legally sufficient claim," and holding that this standard was not met where defendants' allegedly defamatory statements "were absolutely privileged") (internal

*Cards*, "[t]he second stage of the anti-SLAPP inquiry [probability of success on the merits] determines whether 'the complaint is *both* legally sufficient *and* supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'"[51]

### 3. Individual Examination of Claims Is Required

In this case, the Superior Court determined that six of the plaintiffs' twelve claims were fully time-barred and that two others were partially time-barred. It follows from what we have said that, if these claims arose from acts in furtherance of the right of advocacy on issues of public interest, the court should have granted the ASA defendants' special motion to dismiss them.

The defendants also challenge the court's likelihood of success determination regarding the claims that survived their 12(b)(6) motion to dismiss. As we have noted, the court found only that "a number" of the plaintiffs' claims were likely to

---

citations omitted); *Holbrook v. City of Santa Monica*, 51 Cal. Rptr. 3d 181, 187 (Cal. Ct. App. 2006) (plaintiffs could not demonstrate a probability of success on the merits because they lacked standing).

[51] 599 F.3d 894, 902 (9th Cir. 2010) (emphasis added; quoting *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 44 Cal. Rptr. 3d 517, 527 (Ct. App. 2006)).

succeed on the merits because "there may have been" a breach of fiduciary duty or a defect in the passage of the 2013 resolution. The court did not explicitly discuss each claim's individual likelihood of success or the sufficiency of the evidence supporting each claim, nor did it identify which specific counts passed muster. The defendants rightly complain that the court's evaluation therefore did not comply with the Anti-SLAPP Act, which plainly required a claim-by-claim assessment.[52] Our precedent confirms the necessity of a claim-specific analysis of whether the plaintiff is likely to succeed on the merits.[53] Although our review is de novo, the necessary individualized assessment of the plaintiffs' claims is not something this court will undertake "in the first instance."[54]

---

[52] *See* D.C. Code §§ 16-5502(a) ("A party may file a special motion to dismiss any claim . . . ."), 16-5502(b) (motion to dismiss directed to "the claim at issue"), 16-5501(2) (defining "claim" to "include[] any civil lawsuit, claim, complaint, cause of action, cross-claim, counterclaim, or other civil judicial pleading or filing requesting relief"), and 16-5504(a) (authorizing awards of attorney fees and costs where a movant prevails "in whole or in part" on a special motion to dismiss).

[53] *See Mann*, 150 A.3d at 1240–62 (holding that plaintiff successfully established that some of his defamation claims were likely to succeed on the merits, but did not meet his burden with respect to other defamation claims or his claim for intentional infliction of emotional distress).

[54] *Saudi American Pub. Rels. Affs. Comm.*, 242 A.3d at 613 (declining to examine "in the first instance" whether plaintiffs could show they were likely to succeed on their claims, and instead remanding for trial court to hold a hearing and rule on that issue); *see also, e.g., Folks v. District of Columbia*, 93 A.3d 681, 686 (D.C. 2014) ("The trial court did not definitively resolve that issue. We exercise our discretion to leave that issue for resolution by the trial court in the first instance.").

The plaintiffs argue, however, that notwithstanding the foregoing deficiencies in the Superior Court's denial of the anti-SLAPP motion, we should uphold that denial because their claims do not arise from acts in furtherance of the right of advocacy on an issue of public interest. We turn now to this alternative ground for affirmance.

## B. Claims "Arising From" an Act in Furtherance of the Right of Advocacy

### 1. The Required Prima Facie Showing

A party filing a special motion to dismiss must "make[] a prima facie showing that the claim at issue *arises from* an act in furtherance of the right of advocacy on issues of public interest."[55] The Anti-SLAPP Act provides that an "act in furtherance of the right of advocacy on issues of public interest" means:

> (A) Any written or oral statement made:
>
>> (i) In connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; or

---

[55] § 16-5502(b) (emphasis added); *see also* § 16-5502(a) ("A party may file a special motion to dismiss any claim arising from an act in furtherance of the right of advocacy on issues of public interest within 45 days after service of the claim.").

(ii) In a place open to the public or a public forum
in connection with an issue of public interest; or

(B) Any other expression or expressive conduct that
involves petitioning the government or communicating
views to members of the public in connection with an issue
of public interest.[56]

Thus, the movant must make a prima facie showing that the claim at issue "arises from" some form of speech — a "written or oral statement" or other "expression or expressive conduct" — of the specified character.[57]  This accords with "the Anti-

---

[56]  D.C. Code § 16-5501(1).  The term "issue of public interest" is defined to mean "an issue related to health or safety; environmental, economic, or community well-being; the District government; a public figure; or a good, product, or service in the market place," with the qualification that the term "shall not be construed to include private interests, such as statements directed primarily toward protecting the speaker's commercial interests rather than toward commenting on or sharing information about a matter of public significance."  *Id.* §16-5501 (3); *see also* §16-5505 ("Exemptions").

[57]  We understand a "prima facie" showing to be one that the non-movant may attempt to refute.  *See Prima Facie*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Sufficient to establish a fact or raise a presumption unless disproved or rebutted"); *Prima Facie*, WEX LEGAL INFORMATION INSTITUTE (2021), https://www.law.cornell.edu/wex/prima_facie#:~:text=Overview,term%20%22prima%20facie%20evidence.%22&text=A%20prima%20facie%20case%20is,a%20legally%20required%20rebuttable%20presumption; https://perma.cc/4UHX-SKRX ("A prima facie case is a cause of action or defense that is sufficiently established by a party's evidence to justify a verdict in his or her favor, provided such evidence is not rebutted by the other party."); *see also State ex rel. Herbert v. Whims*, 38 N.E.2d 596, 599 (Ohio Ct. App. 1941) ("The words 'prima facie' as used in statutes merely mean a fact presumed to be true unless disproved by some evidence to the contrary, but they always imply that the proper party shall have the opportunity of offering proof in rebuttal of the prima facie facts."); *Pac. Tel. & Tel. Co. v. Wallace*, 75 P.2d 942, 947 (Or. 1938) ("A prima facie case is such as will suffice, until

SLAPP Act's purpose to deter meritless claims filed to harass the defendant for exercising First Amendment rights."[58]

The Anti-SLAPP Act does not define the term "arises from," and we have not had occasion to construe its meaning before now. That is not surprising. Most anti-SLAPP motions seek dismissal of actions for defamation and other torts arising out of allegedly harmful speech.[59] In those actions, a direct link between the claims and the speech is apparent, and the threshold dispute is over whether the Anti-SLAPP

---

contradicted and overcome by other evidence.") (internal quotation marks omitted); *Virginia v. Black*, 538 U.S. 343, 369–70 (2003) ("orthodox" meaning of the term "prima facie evidence" is "evidence that suffices, on its own, to establish a particular fact. But it is hornbook law that this is true only to the extent that the evidence goes unrebutted.").

[58] *Mann*, 150 A.3d at 1239. The First Amendment provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I.

[59] *See Mann*, 150 A.3d at 1220 (plaintiff sued for defamation and intentional infliction of emotional distress from allegedly defamatory publications); *Saudi American Pub. Rels. Affs. Comm.*, 242 A.3d at 607 (suit for defamation, false light invasion of privacy, and intentional infliction of emotional distress); *Fridman*, 229 A.3d at 501 (defamation); *Close It! Title Servs.*, 248 A.3d at 136 (defamation, false light invasion of privacy, and tortious interference with business relations); *Doe No. 1 v. Burke*, 91 A.3d 1031, 1035 (D.C. 2014) (defamation, tortious interference with prospective business advantage, and false light invasion of privacy).

Act protects the defendant's statements, not whether the plaintiff's claims arose from those statements in the first place.[60]

This case is different. Plaintiffs did not assert claims for defamation or, they contend, other tortious speech. They argue that the Anti-SLAPP Act does not apply to their suit at all, because their claims do not arise from speech. Instead, plaintiffs assert, their claims "arise from" various types of corporate wrongdoing — mainly, "the wrongful takeover of a nonprofit corporation, in breach of its bylaws, and the unjustified expenditure of hundreds of thousands of dollars from the nonprofit's trust fund" — that the Act does not purport to protect even if the wrongdoing was related in some way to protected speech (putatively, the 2013 Resolution).[61] Defendants counter that the Anti-SLAPP Act is implicated because were it not for the passage of that Resolution, the plaintiffs "would not be pressing the[ir] myriad of claims."

---

[60] *See Saudi America Pub. Rels. Affs. Comm.*, 242 A.3d at 612–13 (analyzing whether statements were sufficiently connected to an issue of public interest); *Close It! Title Servs.*, 248 A.3d at 143–46 (same).

[61] Plaintiffs do not challenge the Superior Court's ruling that the 2013 Resolution itself was an act in furtherance of public advocacy on an issue of public interest, namely, an issue related to "community well-being." We express no view on the correctness of that ruling.

## 2. The Meaning of "Arises From"

We agree with plaintiffs that the Superior Court did not adequately consider whether each of their claims "arises from" an act in furtherance of the right of advocacy. We conclude it was not enough to find that the 2013 Resolution constituted such an act (as the term is defined) and was related in some way to the non-speech conduct targeted in the plaintiffs' causes of action.[62] Bearing in mind the statutory context in which the words "arise from" are used, we conclude we must interpret them less expansively.

"The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning."[63] But "[a]t the same time, we do not read statutory words in isolation; the language of

---

[62] Appellants propose that "using ASA funds to defend against litigation challenging the Resolution is also protected under the Anti-SLAPP Act as 'conduct that involves petitioning the government . . . in connection with an issue of public interest.'" This may be correct, but as appellants float this contention without developing it, and the trial court did not rely on it when ruling on the special motion to dismiss, we do not consider it in this opinion. *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). The contention may be explored on remand.

[63] *O'Rourke v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 46 A.3d 378, 383 (D.C. 2012) (quotation marks and footnote omitted).

surrounding and related paragraphs may be instrumental to understanding them."[64] "[O]ur focus cannot be too narrow, for the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but also by considering the specific context in which that language is used, and the broader context of the statute as a whole."[65] Where we find ambiguity, we may look for guidance to the statute's purpose and legislative history "to ensure that our interpretation is consistent with legislative intent."[66]

"In cases where we have interpreted the phrase 'arise from' in statutes, we have said that '[a]rise from' may well connote a causal relation less direct and immediate than, say, 'result from'."[67] We have recognized that "statutory language employing the phrase 'arising from' is broad,"[68] but it is not unbounded. We have

---

[64] *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 652 (D.C. 2005).

[65] *O'Rourke*, 46 A.3d at 383 (cleaned up).

[66] *District of Columbia Appleseed Ctr. for L. & Just., Inc. v. District of Columbia Dep't of Ins.*, 214 A.3d 978, 985 (D.C. 2019) (internal quotation marks omitted).

[67] *1230-1250 Twenty-Third St. Cond. Unit Owners Ass'n, Inc. v. Bolandz*, 978 A.2d 1188, 1191 (D.C. 2009) (quoting *Beretta*, 872 A.2d at 652).

[68] *Id.* (quoting *District of Columbia Ins. Guar. Ass'n v. Algernon Blair, Inc.*, 565 A.2d 564, 568 (D.C. 1989)).

rejected efforts to read the phrase so expansively as to effect an implausible enlargement of a statutory cause of action.[69] Generally speaking, "where a claim is said to 'arise from' some predicate, . . . there [must] be a 'substantial connection' or nexus between the predicate and the claim."[70]

Under the Anti-SLAPP Act, therefore, a party filing a special motion to dismiss a claim must show the claim has a substantial connection or nexus to a protected act. D.C. Code § 16-5501(1) provides a highly specific definition of the class of acts that the Anti-SLAPP Act shields. It carefully limits that class to certain categories of *speech*, with the identified aim of protecting "the right of advocacy on issues of public interest." The narrowness and precision of the definition strongly indicates the legislature did not intend the Act's protections to stretch too far. We are led to conclude that the party filing a special motion to dismiss a claim must show that some form of speech within the Anti-SLAPP Act's protection is the basis of the asserted cause of action. A legally objectionable aspect of the protected speech itself — e.g., that the speech is defamatory or otherwise tortious, or violates

---

[69] *See Beretta*, 872 A.2d at 652–53.

[70] *Bolandz*, 978 A.2d at 1191 (quoting *Algernon Blair*, 565 A.2d at 568).

a contract's prohibition — therefore must be the subject of the claim or an element of the cause of action asserted.

This reading is buttressed by the California Supreme Court's interpretation of that state's similar anti-SLAPP statute. Under that law, a party may file a special motion to strike any cause of action "arising from" a protected act in furtherance of the right of petition or free speech in connection with a public issue.[71] As we undertake to do with our Act, the California Supreme Court construed this statutory language in accordance with "the Legislature's intent, as exhibited by the plain meaning of the actual words of the law."[72]

"[T]he 'arising from' requirement is not always easily met," the California Supreme Court observed.[73] "[T]he mere fact an action was filed after protected activity took place does not mean it arose from that activity."[74] "Rather, the act

---

[71] *See* Cal. Civ. Pro. Code § 425.16(b)(1).

[72] *Equilon Enters. v. Consumer Cause, Inc.*, 52 P.3d 685, 689 (Cal. 2002) (quotation marks and citation omitted).

[73] *Id.* at 693.

[74] *Id. See also City of Cotati v. Cashman*, 52 P.3d 695, 701 (Cal. 2002) ("That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such."); *Park v. Bd. of Trs. of Cal. State Univ.*, 393 P.3d 905, 909 (Cal. 2017) (emphasizing the need to "respect the distinction between

underlying the plaintiff's cause or the act which forms the basis for the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech."[75] In other words, the defendant must "demonstrate that the defendant's conduct by which plaintiff claims to have been injured falls within" the statutory definition of protected activity.[76] This means that, "in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability."[77]

In this case, we understand the Superior Court to have accepted a significantly more expansive interpretation of the phrase "arises from." In ruling on the special motion, the judge was "persuaded that the [plaintiffs'] claims . . . fall under the [Anti-Trust Act] because the 2013 Resolution was "related to community well-being, and thus an issue of public interest." But that loose interpretation of "arises from" facilitates special motions to dismiss claims based on non-speech activities that are

---

[protected] activities that form the basis for a claim and those that merely lead to the liability-creating activity or provide evidentiary support for the claim").

[75] *Equilon Enters.*, 52 P.2d at 693 (cleaned up).

[76] *Id.*

[77] *Park v. Bd. of Trs. of Cal. State Univ.*, 393 P.3d 905, 908 (Cal. 2017).

merely tangentially related to protected speech, extending the Anti-SLAPP Act to cover activities outside the statutory definition of protected acts; it thereby burdens claims based on conduct the Act was not meant to shield.[78]  This upsets the delicate balance that the special motion to dismiss was intended to strike.  As we explained in *Mann*, "the special motion to dismiss in the Anti-SLAPP Act must be interpreted as a tool calibrated to take due account of the constitutional interests of [both parties] . . . ; *it is not a sledgehammer meant to get rid of any claim against a defendant*."[79]

The legislative history of the Anti-SLAPP Act is also informative.  As originally introduced in 2010, the statute would have permitted special motions to dismiss "any claim arising from an act in furtherance of the right of free speech," which was defined to include not only speech but also "[*a*]*ny other conduct* in furtherance of the constitutional right to petition the government or the constitutional

---

[78]  We think it most implausible, for example, that the Anti-SLAPP Act enables a defendant sued for embezzling or misappropriating entrusted funds to file a special motion to dismiss based on a showing that the funds were used in furtherance of the right of advocacy on an issue of public interest.  It would be strange to say such a lawsuit "arises from" statutorily protected activity rather than from the defendant's defalcation, regardless of whether the plaintiff disapproved of the defendant's speech; equally strange to suggest that the Anti-SLAPP Act was meant to benefit such a defendant.

[79]  *Mann*, 150 A.3d at 1239 (emphasis added).

right of free expression in connection with an issue of public interest."[80]   This definition reasonably could have been construed to cover not only speech, but at least some related non-speech conduct as well[81] (although that does not, in fact, appear from the Committee Report on the bill to have been intended).[82]   But at the suggestion of the ACLU,[83] the Council removed the part of the definition encompassing "any other conduct" and replaced it with narrower language more clearly limited to speech: "Any other *expression or expressive* conduct that involves petitioning the government or communicating views to members of the public in connection with an issue of public interest."[84]

---

[80]   2010 Committee Report, Attachment 1, at 1–2 (emphasis added).

[81]   *Cf. Mullen v. Meredith Corp.*, 353 P.3d 598, 603–04 (Or. Ct. App. 2015) (reading "arises out of" language in anti-SLAPP law flexibly because the "statutory text speaks broadly of 'any claim' that arises out of 'conduct in furtherance of' free speech rights").

[82]   This is not surprising.  As the 2010 Committee Report noted in explaining the need for the legislation, the "vast majority" of SLAPP suits "were brought under legal charges of defamation (such as libel and slander), or as such business torts as interference with contract" that typically are based on speech.  2010 Committee Report at 2.

[83]   *See id.*, Attachment 2, Testimony of the American Civil Liberties Union of the Nation's Capital by Arthur B. Spitzer, Legal Director, on Bill 18-893, the "Anti-SLAPP Act of 2010" at 5 (Sept. 17, 2010).

[84]   D.C. Code § 16-5501(1)(B) (emphasis added).

Appellants propose that a claim should nonetheless be deemed to arise from protected activity if the plaintiff's subjective motivation for asserting the claim was a desire to chill or punish speech. But the statutory text does not call for inquiry into the plaintiff's motives; it focuses on the claim, not the claimant. Nor does anything in the legislative history suggest the Council envisioned an examination of the plaintiff's motives in connection with special motions to dismiss. This contrasts with some state anti-SLAPP laws that do call for examination of the plaintiff's subjective motivation.[85]

---

[85] *See, e.g.,* Md. Code. Ann. Cts. & Jd. Proc. § 5-807(b) (West 2010) ("A lawsuit is a SLAPP suit if it is: (1) *Brought in bad faith* against a party who has communicated with a federal, State, or local government body or the public at large to report on, comment on, rule on, challenge, oppose, or in any other way exercise rights under the First Amendment . . . regarding . . . any issue of public concern; (2) Materially related to the defendant's communication; and (3) *Intended to inhibit* or inhibits the exercise of rights under the First Amendment") (emphases added); Tex. Civ. Prac. & Rem. Code Ann. § 27.007(a) (West 2019) (allowing for additional findings "regarding whether the legal action was brought to deter or prevent the moving party from exercising constitutional rights"); *Blanchard v. Steward Carney Hosp.*, 75 N.E.3d 21, 38 (Mass. 2017) (nonmoving party may avoid dismissal under anti-SLAPP statute "by demonstrating that each . . . claim was not primarily brought to chill the special movant's legitimate petitioning activities."); *Atlanta Humane Soc'y v. Harkins*, 603 S.E.2d 289, 294 (Ga. 2004) ("Before the trial court is authorized to dismiss the claim, it must further determine . . . *that the claim is interposed for an improper purpose* or without a reasonable belief that it is well grounded in fact and is warranted by good-faith reliance on existing substantive law) (emphasis added) (citing prior version of Ga. Code Ann. § 9-11-11.1(b) (West 1998), amended in 2016).

There is no doubt that the Council was concerned with "prevent[ing] the attempted muzzling of opposing points of view" via SLAPPs,[86] but it did not elect to do so by authorizing the trial court to explore the plaintiff's underlying motives in asserting a claim. Instead, the Anti-SLAPP Act instructs courts to determine whether the claim at issue "arises from" a protected act. We think no sensible reading of that language could lead to a conclusion that the Council intended courts to gauge a plaintiff's subjective reasons for filing their claims.[87]

In sum, we hold that the prima facie showing required to support a special motion to dismiss a claim under the District of Columbia Anti-SLAPP Act is a

---

[86] 2010 Committee Report, at 4.

[87] The California Supreme Court has reached the same conclusion about that state's similarly worded anti-SLAPP statute. *See Equilon Enters.*, 52 P.3d at 688 (Cal. 2002) ("[T]here simply is nothing in the statute requiring the court to engage in an inquiry as to the plaintiff's subjective motivations before it may determine [whether] the anti-SLAPP statute is applicable.") (internal quotation marks and citation omitted); *Cashman*, 52 P.3d at 701 (Cal. 2002) (plaintiff's "subjective intent [in filing suit] is not relevant under the anti-SLAPP statute"); *id*. at 700 ("The anti-SLAPP statute cannot be read to mean that any claim asserted in an action which arguably was filed in retaliation for the exercise of speech or petition rights falls under [the special motion to strike provision] whether or not the claim is based on conduct in exercise of those rights." (cleaned up)); *see also Abrams v. Sanson*, 458 P.3d 1062, 1070 n.7 (Nev. 2020) ("Our anti-SLAPP statutes have no . . . preliminary requirement that a district court consider motive").

showing that the claim is based on the movant's protected activity, i.e., that such activity is an element of the challenged cause of action.

### 3. The Claims at Issue

In this case, the Superior Court did not have the benefit of our holding, and it did not examine plaintiffs' dozen claims according to the proper standard. On their face, however, there is serious question whether a number of those claims are based on the speech — the 2013 Resolution — that constituted the ASA defendants' assertedly protected activity.

Counts one and two of the complaint touch on facts that are related to the 2013 Resolution, but the wrongful acts that they identify predate its adoption and promulgation. Count one alleges that the individual defendants breached their fiduciary duties to the ASA and its members during the preliminary discussions on the 2013 Resolution and when seeking appointment to the National Council by misrepresenting and/or omitting material facts "regarding (1) their personal political agenda . . . to advance the purposes of USACBI by causing the [ASA] to adopt and implement the boycott, and (2) the expected costs of the Academic Boycott." Count two further alleges that the individual defendants violated their "duties of care, good faith, loyalty, and candor" by, in part, "manipulating the nomination and voting

process, miscounting votes . . . [and] withholding voting rights from certain members" in contravention of the association's bylaws. We think it unclear whether either of these counts alleges a cause of action based on protected activity.

The same can be said for several of the other counts. Count three contends that the individual appellants violated the ASA's constitution by failing to nominate candidates who were "representative of the [ideological] diversity of the association's membership" for various leadership positions prior to 2013. Count four alleges that the ASA's constitution prohibited the freezing of the membership rolls that prevented plaintiff Barton from voting on the 2013 Resolution.[88] Counts six and seven also challenge the process by which the 2013 Resolution was adopted. They allege that: (1) the Resolution did not obtain the two-thirds majority required by the ASA's bylaws, and (2) the vote was held in violation of quorum requirements. Finally, although counts ten through twelve concern conduct subsequent to the promulgation of the 2013 Resolution, they do not appear to be based on the Resolution itself. Instead, these counts take issue with the ASA's purportedly unjustified non-renewal of Mr. Bronner's editorial contract and its alleged mismanagement of the Encyclopedia.

---

[88] Count eight reiterates this theory.

On the other hand, at least two counts do appear to be based on the 2013 Resolution. Count nine alleges that the individual appellants' use of funds to "declare enacted" the 2013 Resolution amounted to corporate waste, while count five casts the Resolution as an improper attempt to influence Israeli and American legislation.[89]

We express no view at this time as to whether the ASA defendants met their burden of showing that any of the plaintiffs' claims arise from acts in furtherance of the right of advocacy on issues of public interest. Like the question of whether the plaintiffs have demonstrated they are likely to succeed on the merits of any of their claims, this threshold issue should be examined in the first instance, claim by claim, by the trial court.

### III. Conclusion

To sum up, a special motion to dismiss claims under the Anti-SLAPP Act contemplates a two-step analysis with respect to each challenged claim. At the first

---

[89] Section 4 of the ASA's Statement of Election, which formalized its incorporation under the Nonprofit Corporation Act, provides that "[n]o substantial part of the activities of the corporation shall be the carrying on of propaganda or otherwise attempting, to influence legislation."

step, the movant must make a prima facie showing that each claim at issue "arises from" an act in furtherance of the right of advocacy on an issue of public interest. To determine whether the movant has made that showing, the court must examine whether each claim is based on such protected activity. If the court concludes the movant has made the necessary showing, it must grant the special motion unless the responding party demonstrates the claim is "likely to succeed on the merits," in which case the motion must be denied. A determination by the court pursuant to Rule 12(b)(6) that the responding party has failed to state a claim on which relief can be granted suffices to establish that the claim is not "likely to succeed on the merits." The court should rule on the special motion to dismiss with respect to each claim, even if it grants a 12(b)(6) motion to dismiss that claim.

Because the Superior Court did not carry out the two-step analysis in the manner we hold the Anti-SLAPP Act requires, we vacate the denial of the special motion to dismiss and remand for further proceedings consistent with this opinion.

*So ordered.*